# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| DEBORAH FELLNER, | : | |
| | : | |
| Plaintiff | : | Civil Action 2:06-cv-00688-DMC-MF |
| | : | |
| vs. | : | |
| | : | |
| TRI-UNION SEAFOODS, L.L.C., | : | PLAINTIFF'S OPPOSITION TO |
| d/b/a CHICKEN OF THE SEA, | : | DEFENDANT'S 12(b)(6) MOTION |
| | : | |
| Defendant. | : | |
| | : | |

---

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

---

Barry R. Eichen
**Eichen Levinson & Crutchlow, LLP**
40 Ethel Road
Edison, New Jersey 08817
(732) 777-0100
Attorneys for Plaintiff

On the Brief:  Barry R. Eichen, Esq.
                Christian Mastondrea, Esq.
                Thomas Paciorkowski, Esq.
                Kate Carballo, Esq.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................iii

INTRODUCTION & FACTUAL BACKGROUND ....................................................................1

I.   THE AMENDED COMPLAINT ........................................................................................1

A. Alleged "Over-Consumption" and "Abnormal" Use of Tri-Union Seafood ....................1

II.   METHYLMERCURY IN SEAFOOD ..............................................................................2

LEGAL ARGUMENT ..........................................................................................................3

III.   LEGAL STANDARDS FOR A 12(b)(6) MOTION TO DISMISS ...................................3

A. The Allegations Contained in the Plaintiff's Amended Complaint are Sufficient to State the Claim Pursuant to rule 12(b)(6) ...................................................................4

B. Plaintiff's PLA claim Does not Subsume her CFA claim Because Plaintiff is Seeking Remedies that are Available in the Same Proceeding Under both Acts .............................5

1. In her CFA claim, Plaintiff alleges ascertainable economic loss whereas in her PLA claim, Plaintiff alleges personal injury ...................................................................6

2. CFA claim for economic loss due to Defendant's omission of material fact is not equivalent to a claim under the PLA for personal injury for "failure to warn" ...........8

C. Judicial Estoppel is Unwarranted ...................................................................10

D. Tri-Union has a Duty to Warn Consumers that its Tuna Products Contain Mercury .......14

E. Plaintiff's One Serving per day Consumption of Tri-Union's Albacore Tuna was not Abnormal or Over Consumption .......................................................................17

1. Defendant's Contentions of "Abnormal Over-Consumption" of Tri-Union Tuna are Weight-Of-Evidence Arguments and Affirmative Defenses that have No Place in a Motion to Dismiss .......................................................................................17

2. Defendant's "Over-Consumption" and "Abnormal" use Analogies and Caselaw are Inapposite, and Nothing Supports the Proposition that Lay Consumers Knew of the Presence, Let Alone Risks, of Mercury in Tri-Union's Albacore Tuna Products ...... 19

3. New Jersey Law Imposes a Duty To Warn for Products That are Dangerous With Prolonged Use .......................................................................................20

4. There Is Nothing To Support The Contention That The Presence Of Harmful Mercury In Tri-Union's Albacore Tuna Products Was Or Is A "Commonly Known Danger ..21

i

F.   Plaintiff's Claims for Breach of Warranty and Strict Liability Should not be Dismissed Because in the Absence of a Warning Label, an Average Consumer could not Anticipate or Guard Against the Methylmercury Present in the Defendant's Tuna Product ..............22

   1.   The Inquiry of Whether Methylmercury in Tuna Fish is a "Naturally-Occurring Substance" is only Important on the Issue of Whether an Average Consumer may Reasonably Expect Defendant's Tuna Product to Contain High Levels of methylmercury ...........................................................................................................22

G.   Dismissal of Plaintiff's Amended Complaint Will be Detrimental to Public Policy since an Average Consumer of Tuna Fish will Remain Uninformed that Consumption of Tuna can Lead to Mercury Poisoning .......................................................................................27

CONCLUSION ................................................................................................... 31

# TABLE OF AUTHORITIES

**CASES**                                                                                          **PAGE**

### THE SUPREME COURT OF THE UNITED STATES

Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007)……………………………………...…….4

Conley v. Gibson, 355 US 41 (1957)………...……………………………………………...3, 31

Hishon v. King & Spalding, 467 U.S. 69 (1984) ……………………………………………3

Scheuer v. Rhodes, 416 U.S. 232 (1974) …………………………………………………3

### COURT OF APPEALS FOR THE THIRD CIRCUIT

Adams Golf, Inc. Securities Litigation, 381 F.3d 267 (3d Cir. 2004)………………………18, 21

Bogosian v. Gulf Oil Corp., 561 F.2d 434 (3d Cir. 1977) ………………………………………..3

Brown v. Phillip Morris, Inc., 250 F.3d 789 (3d Cir. 2001) ………………………………………..3

Dilworth v. Metropolitan Insurance Co., 418 F.3d 345 (3d Cir. 2005)…………….....18, 21, 30

Fellner v. Tri-Union Seafoods, L.L.C., 539 F.3d 237 (3d Cir. 2008)……………………...……13

Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. General Motors Corp., 337 F.3d 314 (3d Cir. 2003)…………………………………………………………………………………………………..11

Montrose Med. Group Participating Savings Plan v. Bulger, 243 F.3d 773 (3d Cir. 2001)……..11

Repola v. Morbark Industires, 934 F.2d 483 (3d Cir. 1991) …………………...……………..…..6

Stecyk v. Bell Helicopter Textron, Inc., 295 F.3d 408 (3d Cir. 2002)…………………………..18

Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts, Inc., 140 F.3d 478 (3d Cir. 1998)…….4

Unger v. National Residents Matching Program, 928 F.2d 1392 (3d Cir. 1991) ………………...3

### UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY

Nafar v. Hollywood Tanning Sys., Unpublished 2007 WL 1101440 (D.N.J. Apr. 10, 2007) …...8

### NEW JERSEY

Campos v. Firestone Tire & Rubber Co., 98 N.J. 198, (1984)…………………………………..17

Koster v. Scotch Associates, 273 N.J.Super. 102 (Law Div. 1993)…………………………..26

Mathews v. Univ. Loft Co., 387 N.J.Super. 349 (App. Div. 2006)………………………….…..17

Sofman v. Denham Food Services, 37 N.J. 304 (1962)……………………………………...…23, 25

Sprenger v. Trout, 375 N.J.Super.120 (App. Div. 2005) …………………………………….…..7

Torsiello v. Whitehall Laboratories, 165 N.J.Super. 311 (App. Div. 1979)…………..…19, 20, 21

## OTHER JURISDICTIONS

Clime v. Dewey Beach Enterprises, Inc., 831 F. Supp. 341 (D.De. 1993)…………………...26, 27

Jackson v. Nestle-Beich, Inc., 147 Ill 2d 408 (1992) ……………………………………………25

Mix v. Ingersoll Candy Co., 6 Cal. 2d 674 (1936) …………………………………………………23

Musso v. Picasdilly Cafeterias, Inc., 178 So. 2d 421 (La App. 1st Cir., 1965) …………………23

People ex rel. brown v. Tri-Union Seafoods, LLC, 171 Cal. App. 4th 1549 (1st Dist. 2009) …...22

Williams v. Braum Ice Cream Stores, Inc., 534 P.2d 700 (Okla. App. 1974) ……………………24

Zabner v. Howard Johnson's Inc., 201 So. 2d 824 (Fla. App. 4th Dis. 1967)……………………24

Plaintiff respectfully submits this Memorandum of Law in Opposition to the Defendant's Fed. R. Civ. P. 12(b)(6) Motion to Dismiss the Complaint. The claims contained in Plaintiff's Complaint are sufficient as a matter of law, and should not be dismissed.

## INTRODUCTION & FACTUAL BACKGROUND

## I.     THE AMENDED COMPLAINT

Plaintiff Deborah Fellner brought suit against the Defendant, alleging violations of the New Jersey Products Liability Act ("NJPLA"), N.J.S.A. 2A:58C-1 *et seq*. and the New Jersey Consumer Fraud Act ("NJCFA"), N.J.S.A. 56:8-1 *et seq*. for caning and distributing albacore tuna containing harmful mercury compounds, yet failing to warn and disclose that its products contains mercury compounds, and the harms associated with mercury in its albacore tuna products.

### A.     Alleged "Over-Consumption" and "Abnormal" Use of Tri-Union Seafood

Defendant contends that it is not liable for Plaintiff's injuries because of what the Defendant characterizes as "abnormal consumption" of its tuna products. Defendant compares the Plaintiff's consumption of its albacore tuna products to overindulgence in alcohol, fatty fast foods, and candies. Setting aside whether plaintiff's consumption was "abnormal," which is a question of fact for the jury, or the Defendant's long history of promoting its tuna products as health foods, Tri-Union is now doing an about face and likening its tuna to harmful products whose inherent risks are well known. The Defendant's examples are inapposite and akin to comparing apples and oranges.

The food products cited by the Defendant carry risks that are well known, that are inherent in the food products themselves as opposed to an undisclosed extraneous product such as mercury, whose inherent risks could rightly be beyond a remedy *for those particular risks*. Unlike such scenarios, Plaintiff does not seek recovery for harm arising from a well-known risk that is inherent in canned tuna. Instead, Plaintiff seeks recovery for harm caused by an undisclosed risk – that of mercury contained in Tri-Union's albacore tuna.

## II.    METHYLMERCURY IN SEAFOOD

The federal food-safety regulatory system is exceptionally fragmented on the issue of methylmercury in seafood. The FDA, the Environmental Protection Agency ("EPA"), and the Agency for Toxic Substances and Disease Registry ("ATSDR"), all have safe levels for human exposure to methylmercury from seafood. None of them agree on what level of mercury represents a threat to consumers. The FDA established an "Action Level" of 1 part per million ("p.p.m.") for methylmercury in commercial food, which is the least stringent of the three agencies.

An independent study that examined canned tuna found on supermarket shelves in Vermont, revealed that the amounts of mercury in white albacore canned tuna had average mercury levels four-times higher than in light tuna, and that 6% or more of the white albacore tuna cans contained mercury at or above the FDA's 1 p.p.m. Michael T. Bender,  *FDA's Failure to Protect Children From Exposure to Mercury in Albacore "White" Canned Tuna*, Mercury Policy Project, June 19, 2003, at 3, ("Exhibit A").

**LEGAL ARGUMENT**

## III.    LEGAL STANDARDS FOR A 12(b)(6) MOTION TO DISMISS

When considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court must accept as true all well-pleaded allegations and view them in the light most favorable to the plaintiff.  Scheuer v. Rhodes, 416 US 232, 236 (1974).  A court must also accept as true any and all reasonable inferences derived from those facts. Unger v. National Residents Matching Program, 928 F.2d 1392, 1400 (3d Cir. 1991). Moreover, it is not necessary for the plaintiff to plead evidence, and it is not necessary to plead the facts that serve as the basis for the claim. Bogosian v. Gulf Oil Corp., 561 F.2d 434, 446 (3d Cir. 1977).

The question before the court is not whether the plaintiff will ultimately prevail; rather, it is whether the plaintiff can prove any set of facts in support of the asserted claims that would entitle the plaintiff to relief.  Hishon v. King & Spalding, 467 US 69, 73 (1984).  A complaint may not be dismissed "*unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.*"  Conley v. Gibson, 355 US 41, 45-46 (1957).  See, also, Brown v. Phillip Morris, Inc., 250 F.3d 789, 796 (3d Cir. 2001).

**A.    THE ALLEGATIONS CONTAINED IN THE PLAINTIFF'S AMENDED COMPLAINT ARE SUFFICIENT TO STATE THE CLAIM PURSUANT TO RULE 12(B)(6).**

As the court is well aware when deciding a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, all allegations in the complaint must be taken as true and viewed in the light most favorable to the plaintiff.  Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts, Inc., 140 F.3d 478, 483 (3d Cir. 1998).  The Supreme Court of the United States specifically indicated that,

> "to survive a motion to dismiss, a complaint must contained sufficient factual matter, except that is true, to "state a claim to relief that is plausible on its face."  Claimant is faced with the plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility    standard is not akin to a "probability requirement," but it asks for more      than   a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are "merely consistent with" a defendant liability,    it "stops short of the line between possibility and plausibility of entitlement to relief."

Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007).  In this particular instance, the plaintiff has plead more than adequate facts consistent with the cause of action, alleged to meet what essentially is a notice pleading standard.

More specifically, in the case at bar, plaintiff, Deborah Fellner has alleged a number of factual elements which simply cannot be denied by the defense.  She has alleged that during the period from 1993 to 2004, she consumed approximately one can of the defendant's Chicken of the Sea albacore tuna product a day.  She further alleges and the defendant must acknowledge that the defendant was aware that these tuna products contained methylmercury and or harmful compounds that could result in

mercury poisoning. Furthermore, the defendant must also admit that the defendant canned and distributed its tuna product without any mercury warning, nor did it adequately disclose the harmful effects of such compounds.

In this particular instance the defense has moved on a number of grounds to dismiss plaintiff's complaint, as noted in their moving papers, the defendants have alleged that Ms. Fellner was properly on notice of the fact methylmercury was contained in the tuna in question due to the fact that there were FDA circulars published on this issue. Given the factual position taken in the rest of the defendant's moving papers, it would be inconceivable that they would thereafter deny the fact that 1) methylmercury was once contained in the products in question and that 2) methylmercury warnings were not placed on the cans in question.

Therefore, all of the elements which are needed to prove a violation in New Jersey Products Liability Act, N.J.S.A. 2A:58-c et seq., are properly and specifically plead as required under a notice pleading provision pursuant to R.12(b)(6). Therefore, defendant's motion must be denied at the present time as the Amended Complaint is specific enough to meet the plausibility standard enunciated above.

**B. PLAINTIFF'S PLA CLAIM DOES NOT SUBSUME HER CFA CLAIM BECAUSE PLAINTIFF IS SEEKING REMEDIES THAT ARE AVAILABLE IN THE SAME PROCEEDING UNDER BOTH ACTS.**

In their moving papers the defense makes two points in support of their argument that the PLA subsumes Plaintiff's claims under the CFA: (1). in both claims, Plaintiff seeks compensation for harm caused by the product and (2). Plaintiff's claim under the CFA alleging omissions of material fact by the Defendant is equivalent to her claim "failure to warn" claim under the PLA.

1. **In her CFA claim, Plaintiff alleges ascertainable economic loss whereas in her PLA claim, Plaintiff alleges personal injury, therefore Plaintiff's PLA claim does not subsume her CFA Claim.**

With regards to their first point, the Defendant is incorrect in its assertion, since Plaintiff's cause of action under both acts seeks redress for two distinct harms authorized by the statutes. Specifically, Plaintiff seeks damages for personal injury suffered as a result of severe mercury poisoning as permitted under the PLA. Plaintiff also seeks to be reimbursed for the economic loss due to purchasing of Tri-Union's tuna for eleven years – an appropriate remedy under the CFA. It is undisputed that the PLA subsumes common-law products liability claims, "thus establishing itself as sole basis of relief under the New Jersey law available to consumers injured by the defective product." Repola v. Morbark Industires, 934 F.2d 483, 492 (3d Cir. 1991). The rule prevents a plaintiff from asserting a claim, other than the one under the PLA, for relief due to harm sustained by the product. Id. However, unlike a common-law products liability action, the PLA cannot subsume Plaintiff's CFA claim where Plaintiff's damages are not limited to her recovery for personal injuries due to a defective product. Such reasoning is based on the premise that the PLA and the CFA were promulgated for entirely different purposes and seek to redress different types of harm.

The PLA has been designed to provide a remedy for a "harm" caused by a defective product. N.J.S.A. § 2A:58C-1 *et. seq.* In order to sustain a claim under the PLA, Plaintiff must have sustained either physical damage to property; personal injury, illness or death; emotional suffering or; loss of consortium or services. N.J.S.A. §2A:58C-1(b)(2). On the other hand, the objective of the CFA is to protect the consumer from seller's wrongful conduct and fraudulent practices. See Sprenger v. Trout, 375 N.J.

Super. 120, 135-136 (App. Div. 2005).  To make a claim under the CFA plaintiff must show:

> The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that other rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, is cleared to be unlawful practice.
>
> N.J.S.A. 56:8-2.

Additionally, under N.J.S.A. 56:8-19 of the CFA, a plaintiff must have suffered, "ascertainable loss of moneys or property, real or personal, as a result of the use or employment by another person of any method, act, or practice declared unlawful under this act or the act hereby amended and supplemented."  Since neither the CFA nor the PLA indicate that both remedies are not available in the same proceeding, it therefore follows that a plaintiff seeking compensation for personal injuries due to a defected product and economic loss suffered as a result of defendant's omission of material fact, is able to proceed with claims under both the PLA and the CFA (assuming that plaintiff is also able to prove the facts underlying both causes of action).

In the present instance, Mrs. Fellner's claim is based on allegations that Tri-Union knowingly concealed a material fact-that their tuna product contained mercury which could lead to mercury poisoning if not consumer in limited quantities. As a result, Plaintiff sustained an economic loss from purchasing the defected tuna over the period of eleven years. In her claim under the PLA, Mrs. Fellner's alleges that Defendant's tuna product was defective by way of Tri-Union's failure to warn the consumers as to the presence of mercury in their product. Unbeknownst to her, Mrs. Fellner's tuna

consumption caused her to suffer severe mercury poisoning, injuries for which she is seeking recovery under the PLA.

**2. A CFA claim for economic loss due to Defendant's omission of material fact is not equivalent to a claim under the PLA for personal injury for "failure to warn."**

Defendant also points out that facts giving rise to Plaintiff's claim under the PLA for failure to warn are the same as those giving rise to her CFA action, and being as such the PLA necessarily subsumes Plaintiff's claim under the CFA. However, Defendant's argument erroneously assumes that a claim under products liability action for failure to warn is equivalent to the claim under the CFA for fraudulent omission of material fact. In Nafar v. Hollywood Tanning Sys., Inc., plaintiff, among other claims, alleged violations of the New Jersey Consumer Fraud Act due to the defendant's fraudulent omissions of "the fact that *any* exposure to ultraviolet rays (UV rays) increases the risk of cancer." Nafar v. Hollywood Tanning Sys., Inc., Unpublished 2007 WL 1101440 *1 (D.N.J. Apr. 10, 2007) (Attached hereto as Exhibit "B").

Plaintiff further alleged that the defendant made affirmative representations to their customers that "exposure to UV rays may help with acne, customers will "look terrific," and UV rays may help those suffering from psoriasis, body weight issues, stress, and seasonal affective disorder." Id. In her complaint, plaintiff alleged damages to her DNA and claimed that she was not informed by the defendant of the health risks associated with UV tanning prior to her purchasing the membership. Id. The defense argued that plaintiff should not be allowed to proceed under the CFA since her claims are subsumed by the PLA claim for "failure to warn" which would be a products liability action rather

than one under the CFA. Id. at *3. In holding that plaintiff was allowed to proceed under the CFA, the Court held:

> [N]afar is not claiming harm for any physical injuries she may have suffered from the use of Defendant's tanning machines, as would be appropriate in a products liability action. Instead she is claiming monetary harm because Defendant failed to inform her of the ill effects of indoor tanning, and had she been informed of those ill effects, she would not have purchased Defendant's services. If Hollywood Tans can construe economic harm resulting from the omission of a material fact as equivalent to a 'failure to warn," this would render the Consumer Fraud Act inapplicable in nearly any situation where fraud is continued on material omissions, as opposed to material misrepresentations.

Nafar, at *5.

Here, Plaintiff's claim under the CFA is not based on personal injuries suffered as a result of consumption of Defendant's albacore tuna product. In fact, Plaintiff does not claim that the tuna itself was harmful, but rather that Defendant's failure to disclose the presence of mercury in their product was the cause of her economic loss. In other words, in her claim under the CFA, Plaintiff is not alleging personal injuries, but that she suffered a monetary loss due to the purchasing of the tuna product and that she would not have purchased Defendant's tuna product if she had known that it contained unsafe levels of methylmercury. Furthermore and contrary to the Defendant's position, the facts underlying Plaintiff's PLA claim are entirely different from the ones that give rise to her claim under the CFA.

Mrs. Fellner's allegations under the PLA are based on the facts that Tri Union's Tuna Product failed to adequately warn consumers that their product contained harmful mercury compounds as well as disclose harmful effects of such compounds. (Pl.'s Amend. Compl. ¶ 5-6). As a result of such statutory violations and negligence, Plaintiff suffered severe mercury poisoning as well as physical and emotional injuries, entitling

her to relief under the PLA. (Pl.'s Amend. Compl. ¶ 7; N.J.S.A. §2A:58C-1(b)(2)). Under the CFA, however, Plaintiff's claim is based on the facts that had the Defendant disclosed that its product contains unsafe levels of methylmercury, Mrs. Fellner would not have purchased the Tuna Product. Thus, under the CFA, Plaintiff seeks to recover for monetary loss she has suffered as a result of purchasing Defendant's Tuna Product. Since Plaintiff seeks relief for two distinct types of harm and her CFA claim is not based upon allegations of harm caused by the product, Mrs. Fellner's PLA claim does not subsume her CFA claims, since neither statute indicates that Plaintiff is unable to proceed with both claims, provided that all the statutory elements are met as they are in this case.

## C.    <u>JUDICIAL ESTOPPEL IS UNWARRANTED</u>

Tri-Union next argues that Plaintiff should be judicially estopped from correcting factual errors in the original Complaint. Plaintiff's original Complaint alleged, "During the period 1999 through 2004, Plaintiff's diet consisted almost exclusively of Tuna Products canned and distributed by the Defendant." (Compl. ¶ 7). Plaintiff's Amended Complaint alleges, "During the period 1993 through 2004, Plaintiff consumed approximately one can per day of Defendant's Chicken of the Sea albacore tuna products." (Pl.'s Amend. Compl. ¶ 3). Plaintiff's Amended Complaint increases Plaintiff's period of consumption of Tri-Union's tuna products by six years, quantifies her daily consumption at one can per day, and specifically names the type of tuna she consumed – albacore.

In its argument for judicial estoppel, Tri-Union claims the allegations in the Amended Complaint are "irreconcilably inconsistent" with the original Complaint and therefore a product of bad faith. (Def.'s Br. 15-16). To the extent the original Complaint

suggested that Plaintiff ate nothing but tuna for five years, it was in error. An Amended Complaint was filed to correct the consumption allegation. It is not bad faith to correct an error. To the extent Tri-Union argues that this court should invoke judicial estoppel to prevent the Plaintiff from correcting an error in the original Complaint, via an Amended Complaint, before it has even filed an Answer in the litigation, is without merit.

To determine the applicability of judicial estoppel, the Third Circuit has identified certain criteria for determining when seemingly inconsistent litigation stances justify its application. "First, the party to be estopped must have taken two positions that are irreconcilably inconsistent. Second, judicial estoppel is unwarranted unless the party changed his or her position in bad faith -i.e., with intent to play fast and loose with the court." Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. General Motors Corp., 337 F.3d 314, 319 (3rd Cir. 2003) (internal quotations and citations omitted).

In Montrose Medical Group Participating Savings Plan v. Bulger, 243 F.3d 773, 782 (3rd Cir. 2001) the Third Circuit made clear that asserting inconsistent claims in the same action is not bad faith. "[W]e hold that it does not constitute bad faith to assert contrary positions in different proceedings when the initial claim was never accepted or adopted by a court or agency. Because the practice is specifically sanctioned by the Federal Rules, asserting inconsistent claims within a single action obviously does not constitute misconduct that threatens the court's integrity." Id.

Contrary to Tri-Union's position, the Third Circuit has held that it is not bad faith to assert inconsistent claims in a Complaint in the same action because the Federal Rules of Civil Procedure allow and condone inconsistent claims. "A party may state as many separate claims or defenses as it has, regardless of consistency." F.R.C.P. 8(d)(3). The

concept of alternate pleadings is illustrated best by the renowned example given by Richard "Racehorse" Haynes at an American Bar Association seminar. "Say you sue me because you say my dog bit you. Well, now this is my defense: My dog doesn't bite. And second, in the alternative, my dog was tied up that night. And third, I don't believe you really got bit. And fourth, I don't have a dog."[1]

Tri-Union further argues that judicial estoppel should be applied in this case because Plaintiff amended her complaint in an "attempt to alter the very core of her claim in order to circumvent Tri-Union's overconsumption argument . . . ." (Def.'s Br.14). But the Third Circuit has made it clear that "a litigant may not be estopped unless he or she has engaged in culpable behavior vis-a-vis the court. As we have stressed time and time again, judicial estoppel is concerned with the relationship between litigants and the legal system, and not with the way that adversaries treat each other. . . . Accordingly, judicial estoppel may not be employed unless a litigant's culpable conduct has assaulted the dignity or authority of the court." <u>Montrose</u>, 243 F.3d at 781. Therefore, Tri-Union's disappointment that its overconsumption defense no longer applies to Plaintiff's Complaint as amended, is no reason for the court to apply judicial estoppel – especially at this early stage of the litigation when the Defendant has yet to file an Answer.

Finally, Tri-Union argues that the Plaintiff should be judicially estopped from amending her tuna fish consumption argument in the Complaint because "Plaintiff succeeded in persuading the Third Circuit to reverse this Court's entry of dismissal." (Def.'s Br.17). In other words, Tri-Union claims that Plaintiff should be judicially estopped from making any changes to her tuna fish consumption argument in the

---

[1] http://www.excaliburautomobile.com/Image/Circle&Sword/Vol3/page5.htm (internal narrative omitted).

Complaint because she was successful in overturning the District Court's dismissal, which was based only on federal preemption and not Plaintiff's consumption claims.

Tri-Union's position is opposite the Third Circuit's holding concerning judicial estoppel. According to the Third Circuit, "if a party's initial position was never accepted by a court or agency, then it is difficult to see how a later change manifests an intent to play fast and loose with the courts, any more than pleading inconsistently in a single action does. We think this insight explains why the consensus view among our sister circuits is that judicial estoppel is inappropriate unless the earlier position was accepted by a court or agency." <u>Montrose</u>, 243 F.3d at 782 (internal quotes and citations omitted).

It is uncontested that neither the District Court nor the Third Circuit adopted any of the Plaintiff's consumption claims in their holdings. As the Third Circuit stated in its decision, "The sole question presented in this appeal is whether Fellner's state claim for damages is preempted by federal law." <u>Fellner v. Tri-Union Seafoods, L.L.C.</u>, 539 F.3d 237, 242 (3rd Cir. 2008). Tri-Union conceded as much in its brief. "Tri-Union acknowledges that the Third Circuit's decision did not turn on the extent of Plaintiff's alleged expose to mercury . . . ." (Def.'s Br. 17). Therefore, because no court has adopted any of Plaintiff's tuna consumption claims, it is inappropriate to judicially estop Plaintiff from making corrections to those claims via an Amended Complaint.

**D.** **TRI-UNION HAS A DUTY TO WARN CONSUMERS THAT ITS TUNA PRODUCTS CONTAIN MERCURY**

Tri-Union argues that it has no duty to warn consumers about the risks associated with eating its mercury laden albacore tuna products because those risks are commonly known. Without citing any evidence to support the "common knowledge" part of its claim, Tri-Union claims that "it is common knowledge that methylmercury is present in tuna, and that excessive consumption of canned tuna containing trace amounts of methylmercury may lead to elevated mercury accumulation." (Def.'s Br.19). Tri-Union then cites to the FDA Backgrounder that it attached as Exhibit E to its motion. According to the FDA Backgrounder, because albacore tuna contains even more mercury than most fish, both the Food & Drug Administration, and the Environmental Protection Agency recommend no more than one serving of albacore tuna per week.[2] In other words, Tri-Union claims that it does not have to warn consumers that its albacore tuna products contain high levels of mercury, and that more than one serving per week can expose consumers to mercury poisoning, because that information is commonly known by all.

What undermines Tri-Union's "common knowledge" argument is that the FDA specifically wrote in its 2004 Backgrounder that this was the first time any advisory specifically addressed albacore tuna.[3] Plaintiff consumed Tri-Union's albacore tuna between 1993 and 2004. Therefore she could not have known, prior to 2004, about the

---

[2] FDA Backgrounder 2004, Key Parts of the Advisory, 2 ("Another commonly eaten fish, albacore ('white') tuna has more mercury than canned light tuna. So, when choosing your two meals of fish and shellfish, you may eat up to 6 ounces (one average meal) of albacore tuna per week.")

[3] Id., The Difference Between This Advisory and Previous Advisories, 3 ("The advisory for the first time specifically addresses canned light tuna and canned albacore ("white") tuna, as well as tuna steaks.").

dangerously high levels of mercury in albacore tuna or the one serving per week limitation because the FDA never published that information until 2004.

The most damaging evidence against Tri-Union's assertion that the FDA Advisories were "common knowledge" is contained in a letter from FDA Commissioner, Lester Crawford, to California Attorney General, Bill Lockyer, which Tri-Union relies on and attached to its brief as Exhibit F.

In paragraph six of said letter, Crawford states that the FDA advisories target only "pregnant women, women who might become pregnant, nursing mothers, and young children." Crawford further states that the FDA advisories are not common knowledge because the "consumer advisories are communicated to the target audience directly, rather than to all consumers." Crawford elaborates that the reason the FDA advisories are not communicated to men, or women who are not pregnant or likely to become pregnant, is that those groups "might eat less fish or refrain from eating fish altogether when they receive information about the mercury content of fish and possible health effects to the target audience." Absent any evidence by Tri-Union to the contrary, this court should assume that the FDA was successful in its scheme to withhold its advisories from the general public, as that was clearly its intent.

Deborah Fellner was never a member of the FDA's target audience for these advisories. She was never privy to any of the information contained within said advisories while she consumed Tri-Union's mercury laden albacore tuna products. Tri-Union cites no authority that it was "common knowledge" that its albacore tuna products contained high levels of mercury, and anything more than one serving per week can expose you to mercury poisoning.

Tri-Union also argues that it has no duty to warn Plaintiff about the risks associated with eating its mercury laden albacore tuna because "this court took judicial notice over publications detailing the presence of methylmercury in canned tuna, Plaintiff had imputed knowledge of the same, and cannot now claim failure to warn." (Def. Br. 21).

Once again, Tri-Union makes an irrational and unsubstantiated argument. Tri-Union fails to cite any authority purporting to alleviate a manufacturer's duty to warn because a court took judicial notice of a publication. If Tri-Union's argument was true, then the court doors would close to anyone with a failure to warn claim as soon as information about the product's hidden or latent dangers was published in anything a court could take judicial notice of – whether or not the plaintiff had actual notice of that information.

What makes Tri-Union's judicial notice argument even more implausible is that Tri-Union is attempting to impute publication notice on the Plaintiff for a time period that occurred before the information was even published. In Plaintiff's Amended Complaint, she alleges that she consumed Tri-Union's albacore tuna products between the years 1993 and 2004. Every publication that Tri-Union has asked this Court to take judicial notice of was published in 2004 or sometime thereafter. (Def. Br. 5). It defies common sense to extinguish Plaintiff's failure to warn claims for a time period that occurred before the information was even published.

Even if it were common knowledge (which it is not) that albacore tuna contained high levels of mercury and eating more than one serving per week could expose you to mercury poisoning, that would not extinguish a failure to warn claim in New Jersey. "[I]n

16

our state the obviousness of a danger, as distinguished from a plaintiff's subjective knowledge of a danger, is merely one element to be factored into the analysis to determine whether a duty to warn exists. A manufacturer is not automatically relieved of his duty to warn merely because the danger is patent." Mathews v. Univ. Loft Co., 387 N.J.Super. 349, 357 (App. Div. 2006), quoting Campos v. Firestone Tire & Rubber Co., 98 N.J. 198, 207 (1984).

Amazingly, Tri-Union cites Mathews to support its hard line approach that "[t]here is no such duty to warn, however, when the risk and the way to avoid it are obvious. Mathews v. Univ. Loft Co., 387 N.J.Super. 349, 358 (App. Div. 2006)." Defendant's Brief, p.19. But nowhere in Mathews between pages 358 and 359 does the court hold as Tri-Union alleges. If anyone is playing "fast and loose" with this court, it is Tri-Union. Tri-Union cites no authority to alleviate its duty to warn Plaintiff that it was unsafe to consume more than one serving per week of its albacore tuna product.

**E.     PLAINTIFF'S ONE SERVING PER DAY CONSUMPTION OF TRI-UNION'S ALBACORE TUNA WAS NOT ABNORMAL OR OVER CONSUMPTION.**

   **1.     Defendant's Contentions of "Abnormal Over-Consumption" of Tri-Union Tuna are Weight-Of-Evidence Arguments and Affirmative Defenses that have No Place in a Motion to Dismiss**

Tri-Union claims that Plaintiff's prolonged use of its tuna products amounted to "over-consumption" and was thus "abnormal." Based on those conclusory assertions and characterizations, which Plaintiff strongly disputes, Tri-Union seeks to dismiss the Complaint.

As a threshold matter, it should be noted that Defendant is making a weight of evidence argument – whether Plaintiff "over-consumed" Tri-Union's tuna products, or

whether such consumption was "abnormal," are questions of fact that hinge on whether Plaintiff's consumption was reasonable.

Weight of evidence arguments and attendant questions of fact are not properly disposed of in a Fed. R. Civ. P. 12(b)(6) motion, but are for a jury to decide. Dilworth v. Metropolitan Insurance Co., 418 F.3d 345, 354 (3d Cir. 2005) (issues such as reasonableness are questions of fact that ought be presented to a jury). Similarly in Stecyk v. Bell Helicopter Textron, Inc., 295 F.3d 408 (3d Cir. 2002), the Third Circuit addressed and disposed of a defendant's weight of evidence argument during motion practice by holding that such matters are "properly the subject of cross examination" during trial. Id. at 413.

In addition to an improper weight of evidence argument, Defendant is also advancing an affirmative defense with its "over-consumption" and "abnormal" use contentions. An affirmative defense has no place in the pleading stages to dismiss a claim. In Adams Golf, Inc. Securities Litigation, 381 F.3d 267 (3d Cir. 2004), the Court reversed the trial judge's grant of a motion to dismiss, on grounds that the motion involved affirmative defenses as to negative causation. The Third Circuit held that although a defendant may well be able to prove a negative causation theory, causation is an affirmative defense and "an affirmative defense may not be used to dismiss a plaintiff's complaint under Rule 12(b)(6)." Id. at 277. In light of the preceding, the Defendant's "over-consumption" and "abnormal" use arguments do not provide a basis for dismissal.

## 2. Defendant's "Over-Consumption" and "Abnormal" Use Analogies and Caselaw are Inapposite, and Nothing Supports the Proposition that Lay Consumers Knew of the Presence, Let Alone Risks, of Mercury in Tri-Union's Albacore Tuna Products

In further support of its "over-consumption" and "abnormal" use arguments, Tri-Union likens its tuna products to candy, alcohol, fried onion rings and other fattening fast foods that carry well known risks unless consumed in moderation. The problem with the Defendant's analogies is that Plaintiff is not seeking recovery for any harm caused by a well known and inherent risk of tuna[4], but is instead seeking damages stemming from an undisclosed risk – mercury in Tri-Union's tuna products.

There is nothing problematic if one who overindulges in Snickers bars or other candies is barred from suing the manufacturer for dental bills. Nor would it be controversial to bar one who subsists on Big Macs from suing McDonald's for weight gain, obesity, or high cholesterol. However, it would *not* be problematic to permit recovery if the harm which materialized was not amongst the known risks inherent in the product – e.g.; if rather than rotting teeth or clogged arteries, Snickers led to schizophrenia or sterility, or Big Macs led to malignant brain tumors.

Plaintiff does not allege that she was harmed by the tuna itself – a food product that Tri-Union has been lauding and marketing for decades as exceptionally healthy fare. Instead, Plaintiff complains of the harmful *mercury* found in Tri-Union's tuna products. Mercury, whose presence and attendant risks Tri-Union not only failed to reveal, but whose disclosure the Defendant and other seafood manufacturers actively resisted.

---

[4] Plaintiff at present is aware of no known dangers of mercury-free tuna, but would welcome any information from Tri-Union during discovery on the dangers of mercury-free tuna, whether commonly known by the general public or not.

In <u>Torsiello v. Whitehall Laboratories</u>, 165 NJ Super. 311, 398 A.2d 132 (App. Div. 1979), the plaintiff suffered hemorrhaging after prolonged daily use of aspirin, and sought damages against the manufacturer for failure to warn of the dangers inherent in such use. Reversing the trial judge's dismissal of plaintiff's claims, the Appellate Division held that it was for a jury to decide whether the dangers of prolonged use were generally known and understood by lay consumers:

> As to the matter of lay knowledge, we see no justification at all in this record or in anything appropriately subject to judicial notice for the trial judge's assumption that the danger of prolonged aspirin use is commonly appreciated by laymen. Plaintiff, for one, did not know and there was no suggestion in this record that he should have known. It was clearly for the jury to determine whether in fact that danger is, in Restatement verbiage, as "generally known and understood" among lay consumers as it apparently is in medical and pharmaceutical circles.

<u>Id.</u> at 137. Similarly in the instant matter, it would be facetious to contend that Plaintiff knew or should have known the dangers of the (undisclosed) mercury contained in Tri-Union's tuna. Indeed, there is nothing to support the proposition that the lay public is generally aware of even the *presence* of harmful mercury in Tri-Union's tuna, let alone evidence that the lay public is generally aware of the mercury-related dangers of prolonged consumption of Tri-Union's tuna products[5]. In light of the preceding, it is clear that Tri-Union's "over-consumption" and "abnormal" use contentions are not proper grounds for dismissal.

### 3. New Jersey Law Imposes a Duty To Warn for Products That are Dangerous With Prolonged Use

Under New Jersey law, Tri-Union has a duty to warn consumers that its albacore tuna products contain high levels of mercury and eating more than one serving per week

---

[5] Even if we assume, arguendo, that such evidence exists, that would simply put us in the realm of weight of evidence and affirmative defenses, which are properly within the purview of the jury.

could expose you to mercury poisoning with prolonged use. In <u>Torsiello</u>, the Appellate Division held that a manufacturer has a duty to warn of dangers arising from prolonged use. "[I]f the consuming lay public is generally unaware of this inherent danger, then the product is unreasonably dangerous if sold without an accompanying warning as to that specific risk of prolonged use." <u>Id</u>. Tri-Union did not disclose the presence of high levels of mercury in its albacore tuna products nor has it offered anything in support of the proposition that the consuming public knew of the existence of high levels of mercury in its albacore tuna products or that by consuming more than one serving per week, you could be exposed to mercury poisoning. As such, this ground for dismissal must also fail.

4. **There Is Nothing To Support The Contention That The Presence Of Harmful Mercury In Tri-Union's Albacore Tuna Products Was Or Is A "Commonly Known Danger"**

There is no evidence to support the contention that the presence of harmful mercury in Tri-Union's tuna products was "obvious," "common knowledge," or that awareness of such a danger was so widespread that every individual should have known of its existence. Furthermore, and as with Defendant's assertions as to Plaintiff's alleged "over-consumption" or "abnormal" use of Tri-Union's tuna products, whether the risk of mercury in Tri-Union's mercury was a "commonly known danger " is a question of fact for a jury to decide, and one that has no place in a 12(b)(6) motion. <u>Dilworth</u>, 418 F.3d at, 354; <u>Adams Golf, Inc. Securities Litigation</u>, 381 F.3d at 277; and <u>Torsiello</u>, 165 N.J. Super 311.

It is incongruous that Tri-Union should be making this argument, considering how strongly it and other seafood manufacturers resisted all attempts at requiring the placement of a mercury warning or notice on its tuna products. In light of the preceding,

Defendant's "commonly known danger" argument also fails, and dismissal should not be granted on such grounds.

**F.    PLAINTIFF'S CLAIMS FOR BREACH OF WARRANTY AND STRICT LIABILITY SHOULD NOT BE DISMISSED BECAUSE IN THE ABSENCE OF A WARNING LABEL, AN AVERAGE CONSUMER COULD NOT ANTICIPATE OR GUARD AGAINST THE METHYLMERCURY PRESENT IN THE DEFENDANT'S TUNA PRODUCT.**

**1.    The inquiry of whether methylmercury in tuna fish is a "naturally-occurring substance" is only important on the issue of whether an average consumer may reasonably expect defendant's Tuna Product to contain high levels of methylmercury.**

First, the defense argues that methylmercury is a "natural" substance in tuna fish. In support of their argument, the defense relies on a recent decision of the California Appellate court finding that methylmercury occurs naturally in tuna fish, supports their defense that no liability can be imposed since consumers should anticipate "naturally-occurring" substances to be present in their tuna. However, California's court's finding is inapplicable in this case, since that finding was important only to the extent of defendant's liability under the Drinking Water and Toxic Enforcement Act of 1986 (the "Act" hereinafter). <u>People ex rel. brown v. Tri-Union Seafoods, LLC,</u> 171 Cal. App. 4th 1549 (1st Dist. 2009).

In that case, defendants were able to successfully assert a defense that methylmercury was naturally occurring in tuna fish thereby exempting Tuna Companies from complying with the warning mandates required by the Act. <u>Id.</u> at 1567. The court did not address the issues of defendant's liability for breach of warranty of fitness or strict products liability, thus the Court's decision in <u>People v. Tri-Union Seafoods</u> is inapplicable to the present instance. Therefore, without scientific data to support their

contention, Defendant's statement is conclusory and the determination of whether methylmercury is "natural" to the tuna fish, is one for the trier of fact to decide on.

Tri-Union also argues that New Jersey courts have not addressed the issue of liability on the part of vendor for injuries caused by the objects not intended to be present in the food. Even though the New Jersey courts have not been clear in their analysis; liability has been imposed on the food supplier based on the theory of breach of warranty. Sofman v. Denham Food Services, 37 N.J. 304 (1962). Under the "reasonable expectation" test applied by the majority of jurisdictions, the distinction between a "natural" and "foreign" object contained in the food, is only important to a determination of whether a consumer could reasonably expect to find the object in their food,[6] and being as such, methylmercury in Defendant's Tuna Product can in no way be reasonably known and expected to be present by an average consumer.

In addressing the defendant's argument, it is first important to note the distinction between the two existing theories of liability under which food vendors could be held liable under strict liability and breach of implied warranty claims for injuries caused by food products containing objects, relating to, but not intended to be present in the product. What has become known as the "foreign/natural" test promulgated by the California court in Mix v. Ingersoll Candy Co., 6 Cal. 2d 674 (1936), imposes liability, on the basis of implied warranty of fitness for human consumption, on merchants of food containing an object "foreign" to that food that injures a consumer; but exempts the vendor from any liability where the object is "natural" to the food. Musso v. Picasdilly Cafeterias, Inc., 178 So. 2d 421 (La App. 1st Cir., 1965), application den. 179 So. 2d 641 (agreeing with the majority view expressed in Mix and explaining that in determining the

---

[6] Zabner v. Howard Johnson's Inc., 201 So. 2d 824 (Fla. App. 4th Dis. 1967).

warranty implicit in the sale of food it was important to view it in "light of common knowledge).

Under the "reasonable expectation" test on the other hand, whether the object in the food is "natural" or "foreign" is only important in so far as determining whether a consumer might reasonably expect to find such a substance in the particular food product purchased or dish prepared. <u>Zabner v. Howard Johnson's Inc.,</u> 201 So. 2d 824 (Fla. App. 4th Dis. 1967). Liability for breach of warranty under the "reasonable expectation" test is based on an inquiry of what is "reasonably fit" and whether the consumer could have anticipated the object in the food so as to guard against it. <u>Id.</u> The determination of whether the object is "foreign" or "natural" to the food is decided as a matter of law, while the "reasonable expectation" test is a question for a fact finder. <u>Williams v. Braum Ice Cream Stores, Inc.,</u> 534 P.2d 700 (Okla. App. 1974).

Even though New Jersey courts have not explicitly addressed the issue of whether the "reasonable expectation" test or the "foreign/natural" test should be followed in determining the liability for injuries caused by the presence of objects in the food; the "reasonable expectation" test should be applied in this case since the majority of jurisdictions[7] agree that it is preferable to the "foreign/natural" test. See <u>Zabner v. Howard Johnson's Inc.,</u> 201 So. 2d 824, 826 ( Fla. App. 1967) (the court rejected the "foreign/natural" test and held that the "reasonable expectation" test should be followed. Declaring that "The reasoning applied in this test ["foreign/natural"] test is fallacious

---

[7] The following jurisdictions follow the "reasonable expectation test" Alabama, Washington, D.C., Florida, Massachusetts, Ohio, Oklahoma, Rhode Island, Texas, Washington, Wisconsin. The "foreign/natural" test is applied by: Delaware, Iowa, Louisiana and North Carolina. The courts in the states of California, Illinois and New York have been known to apply both tests, without coming to a concrete determination if one was preferable over the other. Jane Massey Draper, *Liability for injury or death allegedly caused by food product containing object related to, but not intended to be present in, product,* 2 A.L.R. 5th 189 (originally published in 1992).

because it assumes that all substances which are natural to the food in one stage or another of preparation are, in fact, anticipated by the average consumer in the final product served. . . . Naturalness of the substance to any ingredients in the food served is important only in determining whether the consumer may reasonably expect to find such substance in the particular type of dish or style of food served." ); See also <u>Jackson v. nestle-Beich, Inc.,</u> 147 Ill 2d 408,412 (1992) (holding that the "foreign/natural" test logic is "unsound" and should be abandoned in favor of reasonable expectation test because it is "[t]oo close to the outdated and discredited doctrine of *caveat emptor.").*

Moreover, despite the Defendant's assertion to the contrary, New Jersey courts have never excused a defendant from liability on the basis that the object found in the consumer's food was "natural" to that product. Instead, the holding in <u>Sofman v. Denham Food Services,</u> 37 N.J. 304 (1962), suggests that New Jersey would apply the "reasonable expectation" test, under which liability should be imposed on Tri-Union since an average consumer does not expect the presence of methylmercury in tuna fish.

In <u>Sofman,</u> the court found that the cafeteria owner was liable to a patron upon an implied warranty of fitness when plaintiff broke his tooth on a "piece of bone or gristle" upon biting into a frankfurter purchased from the defendant. <u>Id.</u> at 306. In their decision, the New Jersey Supreme Court made absolutely no mention of whether the bone in the frankfurter was a natural substance found in processed meat. The holding suggests that the Court applied the "reasonable expectation" test in determining whether the defendant was liable since an average consumer would not expect a bone to be present in processed meat.

More importantly, the Defendant is mistaken as to the law on the issue of contaminants. In <u>Koster v. Scotch Associates</u>, 273 N.J.Super. 102 (Law. Div. 1993) the Court iterated that the well established gist of Uniform Commercial Code ("UCC") 2-314 is that "[a] warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." The <u>Koster</u> Court went on to reject an argument that serving a meal in a restaurant is not a "sale" under the UCC, and held that the legislature's enactment of the UCC effectively repealed caselaw distinguishing between food sold in a supermarket and food sold in a restaurant, and concluded:

> The common law has always imposed a high standard of care on the preparation and serving of food. From very early times, the common law imposed an extraordinary duty on purveyors of food and drink to provide wholesome, pure products. (citations omitted). In fact, it was from these cases that the doctrine of strict liability arose. (citations omitted). Prosser, *The Assault Upon the Citadel (Strict Liability to the Consumer)* (1960) 69 Yale L.J. 1099, 1103, 1114 [tracing doctrine back to 1266 and an English statute prohibiting victualers and cooks from selling "corrupt" food for immediate consumption].

273 N.J.Super. at 109

Tri-Union mistakenly relies on <u>Clime v. Dewey Beach Enterprises, Inc.</u>, 831 F. Supp. 341 (D. De. 1993). In <u>Clime,</u> the Court held that the defendant was not liable for breach of warranty when a patron consumed raw clams at the defendant's restaurant and was later diagnosed with having vibrio septicemia- caused by the ingestion of a bacteria often found in raw fish. <u>Id.</u> at 342. Applying the "reasonable expectation" test, the Court held that "[a] consumer could not reasonably expect to receive a clam free of potentially injuries bacteria"; emphasizing that the food in this case was ingested by the plaintiff in its natural state or as "exactly the way it occurs in the wild." <u>Id.</u> at 349. The Court further declared that "The Court's conclusion is further bolstered by the testimony of plaintiff's

expert who testified that the general public is aware that there are health risks inherent in eating raw shellfish." Id.

Unlike raw clams, Tri-Union's canned tuna is prepared by the Defendant and sold ready-to-eat, without any expectation that the consumer would either thoroughly cook the tuna before consumption, and in so cooking remove the harmful mercury.[8] Moreover, the methylmercury in tuna fish can hardly be analogized to the bacteria in clams, since Tri-Union's Tuna Product is neither sold in its "natural" or unprocessed state, nor can it be said that the general public is aware that consumption of tuna fish can lead to serious health risks due to the presence of methylmercury. Plaintiff's claim is that the mercury in Tri-Union's tuna was harmful when the tuna was sold, that there was nothing she could have done by way of food preparation to cure the defect; and that, coupled with the Defendant's failure to warn, caused her injuries.

**G. DISMISSAL OF PLAINTIFF'S AMENDED COMPLAINT WILL BE DETRIMENTAL TO PUBLIC POLICY SINCE AN AVERAGE CONSUMER OF TUNA FISH WILL REMAIN UNINFORMED THAT CONSUMPTION OF TUNA CAN LEAD TO MERCURY POISONING.**

It is interesting how the Defendant argues that the Court's denial of Tri-Union's Motion to Dismiss, would cause consumers to decrease their consumption of seafood due to the suit's notoriety, when in their previous point, the defense argued that mercury in tuna fish is "naturally occurring" and that the general public is aware of this fact and should reasonably expect Defendant's Tuna Product to contain methylmercury. Moreover, even if arguably, the average consumer expects the presence of methylmercury in Defendant's Tuna Product, the presence of a label on the food should not significantly decrease tuna consumption since the risk would be widely known.

---

[8] Even if cooked, there is no clear evidence that cooking could remove the mercury in Tri-Union's tuna.

Plaintiff agrees with the Defendant that fish are an excellent source of omega-3 fatty acids, which is beneficial to cardiovascular health. However, the health risks associated with consumption of mercury that is present in albacore tuna are not generally known by all and undoubtedly outweigh the dangers of population's decrease of fish consumption. If Tri-Union had warned of mercury in its tuna products, Plaintiff and other consumers would have been able to make informed decisions as to their eating habits, and arranged their diet accordingly.

The defense also argues that the Amended Complaint should be dismissed because doing so would prevent a "decrease in fish consumption, which would have a negative health impact on the multitudes of Americans at risk for cardiovascular disease." (Def.'s Br. 30). It is an exaggerated speculation that a label on albacore tuna would lead to the decrease of consumption of **all fish**, thus exposing many consumers to a higher risk of cardiovascular disease. The FDA has stated that not all fish contain high levels of mercury,[9] consumers would only be informed regarding a potentially hazardous substance contained in the purchased tuna.

Tri-Union also contends that the FDA is concerned with the decrease of fish consumption since the Association has generally "encouraged consumption of fish in the general population while advising a target population of pregnant women, women who may become pregnant, nursing mothers, and young children, to limit-*not avoid*-consumption of tuna." (Def.'s Br. 30). However, in their Consumer Advisory, the FDA specifically states that "[t]he Food and Drug Administration (FDA) and the Environmental Protection Agency (EPA) are advising women who may become

---

[9] In their Backgrounder advisory, the FDA states "Five of the most commonly eaten fish that are low in mercury are shrimp, canned light tuna, salmon, Pollock and catfish." <u>Defendant's Exhibit "E."</u>

pregnant, pregnant women, nursing mothers, and young children to **avoid some types of fish** and eat fish and shellfish that are lower in mercury. Defendant's Exhibit "D," *What You Need to Know about Mercury in Fish and Shellfish,* See also Defendant's Exhibit "E," *Backgrounder (*emphasis added*).* Therefore, not only has the FDA recommended limiting consumption of albacore tuna due to the presence of mercury, it has advised that certain types of fish should be avoided altogether because of high levels of mercury.

It should also be noted that Tri-Union is not a disinterested public interest organization or consumer advocate, but a commercial enterprise that sells fish products for profit-fish whose decreased consumption Tri-Union claims as grounds for dismissing Mrs. Fellner's Amended Complaint. Whether or not fish consumption decreases as a result of warning labels on Defendant's products, there is no public policy consideration that ought to compel the deprivation of an innocent victim of Tri-Union's failure to warn, of her right to seek redress for the serious injuries she sustained as a result of Defendant's wrongful conduct.

The Defendant also inaccurately points out that recognizing a duty to warn consumers of mercury in tuna would unnecessarily expose all vendors to liability for injuries caused as result of a customer's "over-consumption" of a certain foods. In support of this argument, Tri-Union argues that requiring warning labels to be placed on their Tuna Product, would also require "(1) the vendors at Yankee Stadium to warn of the effects of over-consumption of nitrates in hot dogs; (2) warning concerning type-2 diabetes on [sic] Halloween candy; and (3) warnings about coronary heart disease on the packages of butter." (Def.'s Br. 30). However, the problem with Defendant's analogies is that Plaintiff is not seeking recovery for any harm caused by a well known and inherent

risk of tuna, but is instead seeking damages stemming from an undisclosed risk-mercury in Tri-Union's tuna products.

Furthermore, and as pointed out in previous plaints, Plaintiff's diet did not consist of exclusively tuna fish, but rather she consumed one can of albacore tuna per day, without having any reason to believe that consumption of this product should be limited to a serving per week. Moreover, the issue of whether Plaintiff "over-consumed" Tri-Union's tuna, is a question of fact that hinges on whether Mrs. Fellner's consumption of one can of tuna per day was reasonable. Dilworth v. Metropolitan Insurance Co., 418 F.3d 345, 354 (3d Cir. 2005) (issues such as reasonableness are questions of fact that ought be presented to a jury.)

Plaintiff submits that there is a stronger public policy in favor of compelling manufacturers and sellers to disclose the known defects of their products, and to warn consumers of the potential risks of such goods. Doing so would provide consumers with the information necessary for making meaningful choices that would enable them to better conduct their affairs, and enable them to better safeguard their lives and health.

## CONCLUSION

Plaintiff's claim should not be dismissed, as Defendant has failed to demonstrate that Plaintiff cannot prove any set of facts in support of the asserted claims that would entitle her to relief. Hishon v. King & Spalding, 467 US 69, 73 (1984). Nor has the Defendant demonstrated that "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle h[er] to relief." Conley v. Gibson, 355 US 41, 45-46 (1957). Defendant's contentions regarding the reasonableness of Plaintiff's consumption of Tri-Union tuna have no place in a 12(b)(6) motion. Reasonableness is a question for the jury, and there is no evidence that the danger of mercury in Tri-Union's tuna product was or is a "commonly known danger." Whether the harmful mercury in Tri-Union's tuna product was naturally occurring or not has no bearing on the Defendant's duty to warn of its presence. Finally, compelling public policy consideration counsel against the dismissal of Plaintiff's Complaint and the shielding of Tri-Union from liability for its wrongful acts and omissions. In light of the preceding and all of the above, Defendant's motion for dismissal should be rejected.

Respectfully Submitted,

Dated: September 21, 2009

By: _____

Barry R. Eichen
**Eichen Levinson & Crutchlow, LLP**
40 Ethel Road
Edison, New Jersey 08817
(732) 777-0100
Attorneys for Plaintiff