

LEXSEE 2007 U.S. DIST. LEXIS 94758



Cited
As of: Oct 01, 2009

**JOHN PETERS and MARTIN BASTRESS, individually and behalf of all others similarly situated, Plaintiffs, v. LG ELECTRONICS USA, INC. and ZENITH ELECTRONICS CORPORATION, Defendants.**

**Civil Action No. 07-cv-38(DMC)**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY**

*2007 U.S. Dist. LEXIS 94758*

**December 28, 2007, Decided**
**December 28, 2007, Filed**

**NOTICE:** NOT FOR PUBLICATION

FELLNER v. TRI-UNION SEAFOODS, LLC

**COUNSEL:** [*1] For JOHN PETERS, MARTIN BASTRESS, individually and on behalf of all others similarly situated, Plaintiffs: JEAN-MARC ZIMMERMAN, LEAD ATTORNEY, ZIMMERMAN, LEVI & KORSINSKY LLP, WESTFIELD, NJ.

For LG ELECTRONICS USA, INC., ZENITH ELECTRONICS CORPORATION, Defendants: JAMES S. RICHTER, LEAD ATTORNEY, JOSHUA DAVID WINNEKER, WINSTON & STRAWN, LLP, NEWARK, NJ.

**JUDGES:** Dennis M. Cavanaugh, U.S.D.J.

**OPINION BY:** Dennis M. Cavanaugh

**OPINION**

*DENNIS M. CAVANAUGH, U.S.D.J.:*

This matter comes before the Court upon motion by Defendants LG Electronics, Inc. ("LG") and Zenith Electronics Corporation ("Zenith")'s to dismiss Plaintiffs John Peters and Martin Bastress, individually and on behalf of all others similarly situated, (collectively "Plaintiffs")'s Complaint for failure to state a claim with prejudice pursuant to *FED. R. CIV. P. 12(b)(6)* and *FED. R. CIV. P. 9(b)*. Plaintiffs filed a request for a fourteen day extension of time to respond to Defendants' motion to dismiss and stated that the new hearing date was June 25, 2007. As of December 27, 2007, no opposition has been filed. The motion to dismiss is decided without opposition. Pursuant to *Rule 78 of the Federal Rules of Civil Procedure* no oral argument was heard. After carefully

[*2] considering Defendants' motion, and based upon the following, it is the finding of this Court that Defendants' motion to dismiss Plaintiffs' Complaint pursuant to *FED. R. CIV. P. 12(b)(6)* is **granted.**

## I. BACKGROUND

Plaintiffs are a class of consumers, residing in Wisconsin and Pennsylvania, who have purchased Zenith and/or LG brand models D52WLCD, D44WLCD, D60WLCD or RU52SZ30 LCD Projection High Definition Televisions manufactured by Defendants, and claim that the televisions they purchased suffer from an inherent defect making them unfit for their intended use. (Complaint P1). Specifically, Plaintiffs allege that the defect manifests over time and causes blue and/or yellow streaks and blotches to appear and obscure the viewing screen. (Complaint P1). Plaintiffs assert that the High Definition Televisions ("HDTV") provide sharper and brighter images than conventional televisions, by using more lines of resolution and by means of a light engine and associated components. (Complaint P12).

Defendant Zenith Electronics Corporation is a wholly owned subsidiary of Defendant LG Electronics, Inc. (Complaint P11). Plaintiffs allege that Defendants have purposefully availed themselves to New Jersey [*3] courts by having the privilege of conducting business activities in New Jersey and have their principle place of business in New Jersey and selling televisions to Plaintiffs and generally maintaining systematic and continuous business contacts within the State of New Jersey. (Complaint P9). Plaintiffs allege that Defendants are subject to personal jurisdiction in New Jersey because a substantial part of the events and/or omissions and conduct giving rise to Plaintiffs' claims occurred in Englewood Cliffs, New Jersey where Defendants designed, manufactured, sold, marketed, advertised, distributed and/or warranted the televisions at issue. (Complaint P10).

Plaintiffs allege that Defendants knew or should have known that the subject televisions suffered from the defect. (Complaint P13). Plaintiffs allege that despite the fact that Defendants knew or should have known about the defect, Defendants failed to disclose the defect to consumers and continued to misrepresent that the subject affected televisions were fit for their intended purpose. (Complaint P14). Plaintiffs allege Defendants have refused to repair for free the affected televisions which are no longer covered by the warranty, [*4] but have offered to replace the light engine and/or associated components at the expense of the consumer. (Complaint P15). Additionally, Plaintiffs allege that Defendants have charged the class Plaintiffs whose televisions are under warranty, the labor costs associated to replace the light engine and /or associated components. (Complaint P15).

## II. STANDARD OF REVIEW

In deciding a motion to dismiss pursuant to *FED. R. CIV. P. 12(b)(6)*, all allegations in the complaint must be taken as true and viewed in the light most favorable to the plaintiff. *See Warth v. Seldin, 422 U.S. 490, 501, 95 S. Ct. 2197, 45 L. Ed. 2d 343 (1975)*; *Trump Hotels & Casino Resorts, Inc., v. Mirage Resorts Inc., 140 F.3d 478, 483 (3d Cir.1998)*. If, after viewing the allegations in the complaint in the light most favorable to the plaintiff, it appears beyond doubt that no relief could be granted "under any set of facts which could prove consistent with the allegations," a court shall dismiss a complaint for failure to state a claim. *Hishon v. King & Spalding, 467 U.S. 69, 73, 104 S. Ct. 2229, 81 L. Ed. 2d 59 (1984)*. In *Bell Atlantic Corporation v. Twombly* the Supreme Court clarified the *Rule 12(b)(6)* standard. *127 S.Ct. 1955, 167 L. Ed. 2d 929 (2007)*. Specifically, the Court "retired" the language [*5] contained in *Conley v. Gibson, 355 U.S. 41, 78 S. Ct. 99, 2 L. Ed. 2d 80, (1957)*, that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff

can prove no set of facts in support of his claim, which would entitle him to relief." *Id. at 1968* (citing *Conley, 355 U.S. at 45-46*). Instead, the Supreme Court instructed that "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Id. at 1965*.

Pursuant to *FED. R. CIV. P. 12(b)(6)*, relief cannot be granted against Defendants because Plaintiffs' Complaint does not raise a right to the relief sought against Defendants for violation of the New Jersey Consumer Fraud Act, breach of express warranty or common law restitution. Defendants' motion to dismiss Plaintiffs' Complaint is **granted.**

## III. DISCUSSION

### A. Choice of Law

As a federal district court sitting in diversity, this Court must apply the choice of law rules of New Jersey, the forum state. *See Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496-97, 61 S. Ct. 1020, 85 L. Ed. 1477 (1941)*. New Jersey's choice of law rules mandate that the determinative law is that of the state with the greatest interest in governing the particular issue. The first step is [*6] to determine whether a conflict exists between the laws of interested states, and then any conflict shall be determined on an issue-by-issue basis. Next, the Court must identify the governmental policies underlying the law of each state and how those policies are affected by each state's contacts to the litigation. If the state's law is not related to its contacts with the litigation, then the state does not have an interest in having its law applied to the underlying issue. *See Veazey v. Doremus, 103 N.J. 244, 510 A.2d 1187, 1189 (N.J.1986)*. Where no actual conflict of law exists, no choice of law need be made. *See IBM Corp. v. Liberty Mut. Ins. Co., 363 F.3d 137, 143 (2d Cir. 2004)*; *Zavala v. Wal-Mart Stores, Inc., 393 F. Supp. 2d 295, 333 (D.N.J. 2005)*. In that instance, a motion to dismiss under *FED. R. CIV. P. 12(b)(6)* should be decided under New Jersey law. *See Gallerstein v. Berkshire Life Ins. Co. of Am., Civ. No.: 05-5661 (JAG), 2006 U.S. Dist. LEXIS 64487, 2006 WL 2594862, *3 (D.N.J. Sept. 11, 2006)*.

In this case, Plaintiffs have little or no connection to the State of New Jersey, so this Court will apply the law of the Plaintiffs' home states because they have a greater interest in the outcome of their claims to [*7] the extent that a conflict with New Jersey law exists. Plaintiffs allege that the only connection to New Jersey is that a substantial part of the events and/or omissions giving rise to Plaintiffs' claims occurred in New Jersey, where Defendants designed, manufactured, sold, marketed, advertised, distributed and/or warranted the televisions at issue. (Complaint P10). As to an issue-by-issue analysis, there are three issues to be decided in the present motion, violation of the New Jersey Consumer Fraud Act, *N.J.S.A. 56:8-1*, breach of express warranty, and common law restitution/ unjust enrichment.

### B. Violation of The New Jersey Consumer Fraud Act

Plaintiffs' first cause of action alleges a violation of the New Jersey Consumer Fraud Act, *N.J.S.A. 56:8-1* ("NJCFA"). (Complaint PP 29-40). This cause of action shall be governed by the laws of the state of New Jersey as it alleges a violation of this state's statute and thus this state has a greater interest in the outcome than do Plaintiffs' home states.

In order to state a claim upon which relief can be granted under the NJCFA, a plaintiff must allege the following: 1- unlawful conduct by the defendants; 2- an ascertainable loss on the part [*8] of the plaintiff; and 3- a causal relationship between the defendants' unlawful conduct and the plaintiff's ascertainable loss. *See Carton v. Choice Point, 450 F.Supp. 2d 489, 498 (D.N.J. 2006)*. Additionally, any claims alleging fraudulent conduct must be plead with particularity. See *FED. R. CIV. P. 9(b)*, *F.D.I.C. v. Bathgate, 27 F.3d 850, 876*

*(3d. Cir. 1994)*. Plaintiffs have failed to plead any of the elements for allegations of fraud with particularity to warrant relief under NJCFA. In *Lum v. Bank of America*, the Third Circuit stated that a plaintiff may satisfy the pleading requirements of *Rule 9(b)* by pleading the date, place or time of the fraud, or through alternative means of injecting precision and some measure of substantiation into their allegations of fraud. *Lum, 361 F.3d 217, 224 (3d. Cir. 2004)*. The Third Circuit dismissed the *Lum* Plaintiff's claim alleging fraud, holding it was pled with a lack of particularity. In this case specifically, Plaintiffs fail to show which of the two Defendants knew or should have known what and when, and they fail to show what warning should have been disclosed, and they fail to show what, if any, misleading statements were made. (Defendants' [*9] Brief, p. 10). As such, Plaintiffs' allegations that Defendants violated NJCFA fail because they were not plead with particularity as required by *FED. R. CIV. P. 9(b)*. Plaintiffs' fraud claim is dismissed.

### C. Breach of Express Warranty

As mentioned above, where a conflict exists between Plaintiffs' home states and New Jersey law, Plaintiffs' home states shall govern because those states have a greater interest in the outcome of the litigation. *See Veazey v. Doremus, 103 N.J. 244, 510 A.2d 1187, 1189 (N.J.1986)*. Further, the locus of the transaction, from where the epiphany of a contract springs or where the breach of warranty is felt, is the jurisdiction that has the greatest governmental interest in having its breach of contract/warranty laws applied. *Arons v. Rite Aid Corp., 2005 WL 975462 at 22, (N.J. Super, 2005)*.

Plaintiff Bastress' claim (a resident of Wisconsin) for breach of express warranty shall be governed by Wisconsin law because a conflict exists between New Jersey and Wisconsin law on this issue. Specifically, Wisconsin law requires a privity of contract for breach of express warranty claims seeking economic recovery, which is at issue here. (Complaint P 49). New Jersey law does not require [*10] privity between the purchaser and manufacturer to assert breach of express warranty claims. *See Spring Motors Distributors, Inc. v. Ford Motor Company, 98 N.J. 555, 489 A.2d 660 (1985)*. There is a clear conflict, and since Plaintiff Bastress' [1] home state has a greater interest in protecting its residents than does New Jersey, Wisconsin law governs. Further, the Complaint does not allege that Plaintiffs purchased the affected televisions in New Jersey, giving the home states a greater interest in the outcome, as that is where the televisions were presumably purchased. As such, Wisconsin Plaintiffs need to assert privity of contract between them and Defendant manufacturers. Privity was not plead (Complaint PP 41-49), so Wisconsin Plaintiffs' claim for breach of express warranty is dismissed.

> 1 All other Wisconsin Plaintiffs' claims of breach of express warranty will be governed by Wisconsin law.

Plaintiff Peters' claim of breach of an express warranty is governed by Pennsylvania law because there is a conflict with New Jersey law on the issue. As stated above, New Jersey does not require privity between the manufacturer and ultimate consumer in order for the consumer to recover on a breach of express [*11] warranty claim. *See Spring Motors Distributors, Inc., infra, at 555*. In Pennsylvania, however, while there is not an express privity requirement for a breach of express warranty claim, Pennsylvania courts have held that third parties may enforce express warranties only under circumstances where an objective fact finder could reasonably conclude that: (1) the party issuing the warranty intends to extend the specific terms of the warranty to the third party (either directly or through an intermediary); and (2) the third party is aware of the specific terms of the warranty, and the identity of the party issuing the warranty. *Goodman v. PPG*

*Industries, Inc., 2004 PA Super 151, 849 A.2d 1239, 1246, (Pa. Super., 2004).*

Under Pennsylvania law, Plaintiffs have failed to show that the express warranty alleged to have been breached by Defendants met the above criteria. Plaintiffs fail to allege that an express warranty was entered into between Plaintiffs and Defendants, nor do they allege that any express warranty was entered into in reference to the subject televisions. Specifically, in order to create an express warranty, the seller must expressly communicate the terms of the warranty to the buyer in such a manner [*12] that the buyer understands those terms and accepts them. *13 Pa.C.S.A. § 2313.* Plaintiffs do not allege that these actions occurred. As such, Pennsylvania Plaintiffs' claim for breach of an express warranty is dismissed.

### D. *Common Law Restitution/Unjust Enrichment*

Plaintiffs allege that they are entitled to the amount of Defendants' ill-gotten gains, including interest, resulting from its unlawful, unjust and inequitable conduct in selling the affected televisions. (Complaint P 55). Plaintiffs baldy assert that Defendants have acted unjustly by having sold and continuing to sell affected televisions, and thus Plaintiffs are entitled to the profits from same. (Complaint P 51). The court must determine if plaintiff may be entitled to relief under any reasonable reading of the pleadings, assuming the truth of all the factual allegations in the complaint, but a court need not credit a complaint's bald assertions or legal conclusions when deciding a motion to dismiss.

*In re Burlington Coat Factory Securities Litigation, 114 F.3d 1410, 1429-30 (3d Cir. 1997).*

Because Plaintiffs fail to provide substance to the claim for common law restitution/ unjust enrichment, Plaintiffs have failed to set [*13] forth a claim upon which relief can be granted. As noted above, in *Bell Atlantic Corporation v. Twombly* the Supreme Court clarified the *Rule 12(b)(6)* standard. *127 S.Ct. 1955, 167 L. Ed. 2d 929 (2007).* Specifically, the Court "retired" the language contained in *Conley v. Gibson, 355 U.S. 41, 78 S. Ct. 99, 2 L. Ed. 2d 80, (1957),* that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim, which would entitle him to relief." *Id. at 1968* (citing *Conley, 355 U.S. at 45-46*). Instead, the Supreme Court instructed that "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Id. at 1965.* Plaintiffs have failed to show that the claim for common law restitution/ unjust enrichment rises above the speculative level and is thus dismissed.

### IV. *CONCLUSION*

Based on the foregoing, Defendants' motion to dismiss Class Plaintiffs' Complaint is **granted.** An appropriate Order accompanies this Opinion.

/s/ Dennis M. Cavanaugh

Dennis M. Cavanaugh, U.S.D.J.

Date: December 28, 2007


Not Reported in F.Supp.2d, 2007 WL 1101440 (D.N.J.)
**(Cite as: 2007 WL 1101440 (D.N.J.))**

**H**Only the Westlaw citation is currently available.NOT FOR PUBLICATION

United States District Court,
D. New Jersey.
Hadis NAFAR, on behalf of herself and all others
similarly situated, Plaintiff,
v.
HOLLYWOOD TANNING SYSTEMS, INC., Defendant.
**Civil Action No. 06-CV-3826 (DMC).**

April 10, 2007.

Barry Benjamin Cepelewicz, Meiselman, Denlea, Packman, Carton & Eberz, PC, White Plains, NY, for Plaintiff.

Stephen M. Orlofsky, David A. Dorey, Kit Applegate, Blank, Rome, LLP, Cherry Hill, NJ, for Defendant.

**OPINION**

DENNIS M. CAVANAUGH, U.S. District Judge.

**\*1** This matter comes before the Court upon motion by Defendant Hollywood Tanning Systems, Inc. ("Defendant") for partial judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. No oral argument was heard pursuant to Fed.R.Civ.P. 78. After carefully considering the submissions of the parties and for the following reasons, Defendant's motion for partial judgment on the pleadings is **denied.**

**I. BACKGROUND**

Hadis Nafar ("Plaintiff") purchased monthly tanning memberships from Defendant in Middlesex County, New Jersey. Nafar began purchasing monthly memberships in April 2005, and continued through March 2006. Plaintiff then instituted this suit against Hollywood Tans alleging: (1) violation of the New Jersey Consumer Fraud Act, (2) fraud, (3) unjust enrichment, and (4) breach of warranty; and (5) requesting injunctive relief.

Nafar alleges that Hollywood Tans fraudulently omitted the fact that *any* exposure to ultraviolet rays (UV rays) increases the risk of cancer. Plaintiff emphasizes that "excessive exposure" to UV rays is not necessary for harm to occur and that *any* exposure can suffice. Plaintiff goes on to allege that Hollywood Tans made affirmative misrepresentations through its website. Among these alleged misrepresentations are claims that exposure to UV rays may help with acne, customers will "look terrific," and UV rays may help those suffering from psoriasis, body weight issues, stress, and seasonal affective disorder. Nafar contends that Hollywood Tans distorts these "benefits" and deceptively fails to warn consumers about the dangers of indoor tanning. Defendant's website states that its tanning system "block[s] out most of the UVB rays allowing your skin to maintain natural exfoliation [which] helps high pressure tanners to stay tan longer." While Plaintiff acknowledges that Hollywood Tans' machines may block out most UVB rays, she contends that Defendant fails to inform consumers that UVA rays, also emitted by its machines, are linked to skin cancer.

Plaintiff further alleges in her Complaint that both UVA and UVB exposure destroys cell DNA, a precursor to cancer. In addition to direct DNA damage, Plaintiff asserts that ultraviolet light produces activated oxygen molecules that also damage DNA, as well as creating localized immunosuppression that blocks the body's natural anti-cancer defenses. Plaintiff emphasizes that *prior to purchasing* her memberships, Defendant did not inform her about the cancer risks or other health risks attendant with UV tanning. Plaintiff also asserts that she did not receive warnings before her sessions, and she did not sign any consents or waivers acknowledging that she was informed about the health risks of indoor tanning. Nafar disclaims any remedy for personal injuries suffered, but proceeds on her fraud-based causes of action, which provide remedies in treble damages, injunctive relief, punitive damages, attorney's fees, and costs of suit.

**\*2** Hollywood Tans notes that its tanning machines are regulated by the FDA and are required by FDA regulations to carry a label providing:

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1101440 (D.N.J.)
**(Cite as: 2007 WL 1101440 (D.N.J.))**

(1) recommended exposure positions;

(2) directions for achieving the recommended exposure positions and a warning that the use of other positions may result in overexposure;

(3) a recommended exposure schedule including duration and spacing of sequential exposures and maximum exposure times in minutes; and

(4) a statement of the time it may take before the expected results appear.

21 C.F.R. § 1040.20(d)(1)(ii)-(v).

Each machine also carries the following warning, as required by FDA regulations:

DANGER-Ultraviolet radiation. Follow instructions. As with natural sunlight, overexposure can cause eye and skin injury and allergic reactions. Repeated exposure may cause premature aging of skin and skin cancer. WEAR PROTECTIVE EYEWEAR; FAILURE TO DO SO MAY RESULT IN SEVERE BURNS OR LONG-TERM INJURY TO EYES. Medications or cosmetics may increase your sensitivity to the ultraviolet radiation. Consult physician before using sunlamp if you have a history of skin problems or believe yourself especially sensitive to sunlight. If you do not tan in the sun, you are unlikely to tan from use of this product.

21 C.F.R § 1040.20(d)(1)(i).

It is undisputed that Defendant has posted these warnings on its tanning machines in compliance with the FDA regulations.

Hollywood Tans' Motion for Partial Judgment on the Pleadings seeks judgment as to each of Plaintiff's claims that rely on a failure to warn theory, namely claims (1) violation of the New Jersey Consumer Fraud Act, (2) fraud, (3) unjust enrichment, and (5) Plaintiff's request for injunctive relief.

## II. *STANDARD OF REVIEW FOR 12(C) MOTION FOR JUDGMENT ON THE PLEADINGS*

Defendant files this motion for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. While it is generally true that a Rule 12(c) motion for judgment on the pleadings is treated similarly to a motion to dismiss under Rule 12(b)(6), there are significant differences between a Rule 12(c) motion for judgment on the pleadings and a Rule 12(b)(6) motion to dismiss for failure to state a claim.

First, a Rule 12(c) motion is brought after the close of the pleadings, while a Rule 12(b)(6) motion is brought before the close of the pleadings. *Syncsort, Inc. v. Sequential Software, Inc.*, 50 F.Supp.2d 318, 324 (D.N.J.1999). Second, "a Rule 12(b)(6) motion to dismiss is directed solely towards the procedural defects or the statement of the Plaintiff's claim for relief and does not seek to determine the substantive merits of the controversy." 5C Charles Alan Writht & Arthur R. Miller, *Federal Practice and Procedure § 1369* (3d ed.2004).

Thus, whereas a Rule 12(b)(6) motion tests whether a plaintiff's pleading, viewed alone, states a claim, a Rule 12(c) motion moves for judgment on those claims, as pleaded. In this respect, the standard for decision the Court employs mirrors the summary judgment standard.

## III. *DISCUSSION*

### A. Whether Plaintiff's Consumer Fraud Claims are Subsumed by the NJPLA

*3 Hollywood Tans contends that this is a "product liability action" governed by the New Jersey Products Liability Act ("NJPLA"). N.J.S.A. § 2A:58C-1 (b)(3). Defendant interprets Plaintiff's Complaint as alleging damage to her DNA. This DNA damage increases her risk of cancer, which requires that the Defendant properly warn consumers of the risks involved. Hollywood Tans asserts that Plaintiff cannot pursue a consumer fraud theory, attorneys' fees, or other theories on a failure to warn basis because the NJPLA is the sole remedy for products liability actions.

Defendant asserts that a "failure to warn" may constitute a "product defect," which is within the realm of products liability rather than consumer fraud. *See Becker v. Baron Bros.*, 138 N.J. 145, 151-52 (1994).

Not Reported in F.Supp.2d, 2007 WL 1101440 (D.N.J.)
(Cite as: 2007 WL 1101440 (D.N.J.))

("A failure to warn, or a failure to warn properly, can constitute a defect in a product sufficient to support an action in strict liability.").

New Jersey codified its products liability law in the NJPLA. N.J.S.A. § 2A:58C-1 et seq. The NJPLA defines a "product liability action" as "any claim or action brought by a claimant for harm caused by a product, irrespective of the theory underlying the claim, except actions for harm caused by breach of an express warranty." N.J.S.A. § 2A:58C-1(b)(3). Within the NJPLA's purview are claims based on harm caused by a failure "to contain adequate warnings or instructions...." N.J.S.A. § 2A:58C-2.

In order for the NJPLA to apply, Plaintiff must have suffered a "harm" as articulated in the statute. The harm contemplated by the NJPLA is limited to:

(a) physical damage to property, other than to the product itself;

(b) personal physical illness, injury, or death;

(c) pain and suffering, mental anguish or emotional harm; and

(d) loss of consortium or services or other loss deriving from any type of harm described in subparagraphs (a) through (c) of this paragraph.

N.J.S.A. § 2A:58C-1(b)(2).

Hollywood Tans argues that the DNA damage suffered by the Plaintiff, which could lead to cancer, constitutes "harm" under the NJPLA.

Defendant believes that Plaintiff is attempting to avoid the NJPLA by disclaiming recovery for personal injuries and couching her harm as "economic"-monetary harm suffered by the Plaintiff in the form of membership fees that she would not have paid but for Defendant's alleged fraudulent omissions. Despite this "economic" harm, Defendant emphasizes that the harm was "caused by a product," necessitating the NJPLA's exclusive application.

The NJPLA was enacted by the New Jersey Legislature to limit the expansion of products liability law, and is thus, "the sole method to prosecute a product liability action." Tirrell v. Navistar Int'l, Inc., 248 N.J.Super. 390, 398 (App.Div.1991). The Defendant cites Repola v. Morbark Industries, Inc., 934 F.2d 483 (3d Cir.1991), in which the Third Circuit dismissed a failure to warn claim based on negligence because it was subsumed by the NJPLA. Additionally, in Brown v. Phillip Morris, Inc., 228 F.Supp.2d 506 (D.N.J.2002), the court dismissed the plaintiff's intentional fraud claims because the fraud claims were also subsumed by the NJPLA.

*4 If the Consumer Fraud Act ("CFA") claims cannot go forward and are subsumed by the NJPLA, Defendant will no longer face consumer fraud-based treble damages and counsel fees. Additionally, under the NJPLA:

In any product liability action against a manufacturer or seller for harm allegedly caused by a product that was designed in a defective manner, the manufacturer or seller shall not be liable if. .(2) The characteristics of the product are known to the ordinary consumer or user, and the harm was caused by an unsafe aspect of the product that is an inherent characteristic of the product and that would be recognized by the ordinary person who uses or consumes the product with the ordinary knowledge common to the class of persons for whom the product is intended....

N.J.S.A. § 2A:58C-3(a)(2).

Also, "[i]f the warning or instruction given in connection with a drug or device or food or food additive has been approved or prescribed by the ... [FDA], a rebuttable presumption shall arise that the warning or instruction is adequate." N.J.S.A. § 2A:58C-4. Thus, if the NJPLA applies, Hollywood Tans will be able to take advantage of both statutory defenses.

Rather than claiming personal injury damages for "harm caused by a product," Nafar seeks to recover for economic harm that she suffered from purchasing Defendant's services without being warned of the dangers associated with indoor tanning. Additionally, Plaintiff asserts that Defendant only challenges Plaintiff's claims that are based on Hollywood Tan's failure to warn. Therefore, the Complaint has not been challenged as to claims based on affirmative misrepresentation, particularly Claim 4, breach of warranty.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1101440 (D.N.J.)
(Cite as: 2007 WL 1101440 (D.N.J.))

Plaintiff argues that the NJPLA does not apply to this case because the economic harm Nafar suffered is not contemplated within the NJPLA's definition of "harm." In support of this proposition, Plaintiff cites to *Repola*, 934 F.2d at 492 (3d Cir.1991), where the Third Circuit explained that the NJPLA is the sole remedy for "claims falling within its purview." Therefore, the NJPLA's scope is limited by its own definitions of "product liability action" and "harm." *Id.* Although Hollywood Tans argues that Nafar suffered personal injury "harm" as contemplated by the NJPLA, Plaintiff asserts that she has not suffered any personal injury harm. Rather, she claims economic harm as a result of purchasing monthly tanning memberships that she would not have purchased but for Hollywood Tans' deceptive business practices.

In support of her claim that the NJPLA is only limited to the statute's definition of "harm," Nafar cites *Knoster v. Ford Motor Co.*, 2006 U.S.App. LEXIS 22869 (3d Cir. Sept. 6, 2006). In *Knoster*, the plaintiff brought a consumer fraud claim after a car accident, but sought damages for the car itself. The defendant argued that the NJPLA subsumed the consumer fraud claim. However, the Third Circuit held that the damage claim for the car itself was not the type of harm contemplated by the NJPLA; therefore, the consumer fraud claim was allowed to proceed.

*5 Additionally, Plaintiff argues that the NJPLA applies to suits arising from "products," while this suit is based on Hollywood Tans' deception regarding its "services." Plaintiff relies on *Universal Underwriters Ins. Group v. Public Serv. Elec. & Gas Co.*, 103 F.Supp.2d 744, 748 (D.N.J.2000), for the proposition that "when an injury does not result from a defective product, but rather from a service, the NJPLA is inapplicable."

In refutation of Defendant's case analysis, Plaintiff points out that both *Repola*, 934 F.2d 483 and *Brown*, 228 F.Supp.2d 506, are inapposite because they deal with "harm" as it *is* defined in the NJPLA. Plaintiff also claims that Defendant's reliance on *Estate of White v. R.J. Reynolds Tobacco Co.*, 109 F.Supp.2d 424, 431-32 (D.Md.2000) is misplaced. That court relied on the Restatement (Second) of Torts and the consumer expectations test in assessing a strict liability claim. Here, however, Nafar is not asserting a strict liability claim, so the consumer expectation test does not apply. If the court finds that the NJPLA ap-

plies in this case, Plaintiff seeks leave to file an amended complaint to assert claims under that statute.

Nafar alleges that Hollywood Tans misrepresented the benefits of indoor tanning and failed to disclose the harmful effects of its services. Plaintiff further alleges that she suffered a monetary loss because but for these misrepresentations and omissions, she would not have purchased Hollywood Tans' services. These allegations are enough to support a claim under the CFA.

Hollywood Tans argues that Nafar's claim is subsumed by the NJPLA. For Hollywood Tans to succeed on this defense the court would have to construe a deliberate omission of material fact as a "failure to warn." However, there are qualitative differences between a failure to warn in a products liability action and a fraudulent omission of material fact. Here, Nafar is not claiming harm for any physical injuries she may have suffered from the use of Defendant's tanning machines, as would be appropriate in a products liability action. Instead, she is claiming monetary harm because Defendant failed to inform her of the ill effects of indoor tanning, and had she been informed of those ill effects, she would not have purchased Defendant's services. If Hollywood Tans can construe economic harm resulting from the omission of a material fact as equivalent to a "failure to warn," this would render the Consumer Fraud Act inapplicable in nearly any situation where fraud is contingent on material omissions, as opposed to material misrepresentations.

**B. Whether the Risks Associated with UV Exposure are of Such Common Knowledge that Plaintiff Cannot Prevail on a "Knowing Omission" Under the New Jersey Consumer Fraud Act**

Defendant believes that Plaintiff's consumer fraud claim is based on a "knowing omission," specifically that Hollywood Tans failed to warn consumers of the cancer risks associated with its tanning machines. The New Jersey CFA provides that:

*6 The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression or omission, of any material fact with intent that oth-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1101440 (D.N.J.)
(Cite as: 2007 WL 1101440 (D.N.J.))

ers rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice....

N.J.S.A. § 56:8-2.

However, Defendant contends that the CFA only prohibits conduct that would mislead the "average consumer." *See* Dabush v. Mercedes-Benz USA, LLC, 378 N.J.Super. 105, 115 (App.Div.2005) (explaining that "[t]o constitute consumer fraud ... the business practice must be 'misleading' and stand outside the norm of reasonable business practice in that it will victimize the average consumer....").

Hollywood Tans argues that it is a question of law whether its "omission" constitutes consumer fraud because it must be decided whether Hollywood Tans had a duty to disclose in the first place, and "[d]uty is a question of law." *See* Judge v. Blackfin Yacht Corp., 357 N.J.Super. 418, 426 (App.Div.2003). In support of its argument, Defendant cites Strawn v. Canuso, 140 N.J. 43 (1995), where the New Jersey Supreme Court held that a builder-developer had a duty to disclose to prospective buyers the homes' close proximity to an abandoned hazardous waste site. The *Strawn* court emphasized that the builder-developer was liable for physical conditions "known to it and unknown and not readily observable by the buyer...." *Id.* at 65. Therefore, Hollywood Tans asserts that "knowing omission" liability under the CFA arises only if the seller knows of some material fact that is unknown or not readily observable to the buyer. *See* Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, 623 N.Y.S.2d 529, 533 (N.Y.1995) (reasoning that the New York Consumer Fraud Act does not require businesses to "guarantee that each consumer has all relevant information," but businesses may be liable "where the business alone possesses material information that is relevant to the consumer and fails to provide this information."); Beaudreau v. Larry Hill Pontiac, 160 S.W.3d 874, 881 (Ten.Ct.App.2004) (dismissing the plaintiff's claim because "a reasonable customer should be aware that a for-profit retailer, in arranging financing for a consumer, would expect to receive some sort of remuneration for its efforts.").

Defendant first argues that whether a duty exists is a question of law. *See* Petrillo v. Goldberg, 139 N.J. 472, 479 (1995) (determining that "the existence of a duty is a question of law for the court."). Defendant contends that Plaintiffs interpretation of Oswego Laborer's Local, 623 N.Y.S.2d 529 (N.Y.1995), is improper. Plaintiff used that case to establish that the court could not rule on the parties' knowledge as a matter of law. Defendant emphasizes that the court does not have to determine the Plaintiff's subjective knowledge of the harms associated with indoor tanning. Rather, the CFA applies an objective test, and Hollywood Tans argues that the court can determine, based on the facts alleged by Plaintiff and by taking judicial notice of the articles cited by Defendant, whether the risk of cancer was of common knowledge to the average consumer.

*7 Defendant argues that Plaintiff's attempt to distinguish Beaudreau, 160 S.W.3d 874, is unavailing. In *Beaudreau*, the court ruled as a matter of law that there was no duty to disclose and no consumer fraud. Plaintiff claims there was an imputation of knowledge in that case which is not present in this case. The imputation was based on a Federal Reserve Ruling stating that there was no necessity to disclose the dealer reserve. Defendant asserts that Plaintiff must now concede that she has imputed knowledge of the FDA's 1985 regulation warning that tanning machines may cause cancer.

Defendant believes that Plaintiff misinterprets the knowledge requirement for CFA actions. In citing Cipollone v. Ligget Group, Inc., 893 F.2d 541 (3d Cir.1990), a products liability case, Plaintiff noted that the issue whether consumers know of the dangers of cigarettes is a fact issue for the jury. However, Defendant explains that *Cipollone* was a products liability action and not a consumer fraud action. Defendant argues that the issue of "knowledge" in a products liability action goes to the causation requirement, a fact issue. However, in a consumer fraud action, "knowledge" goes to the question of duty, a legal determination made by the court. *See* Strawn, 140 N.J. 43.

Defendant explains that the risks associated with excessive exposure to UV light are commonly known, similar to the way in which the risks of excessive consumption of McDonalds' food is commonly

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1101440 (D.N.J.)
(Cite as: 2007 WL 1101440 (D.N.J.))

known. Hollywood Tans notes that in *Pelman v. McDonald's Corp.,* 237 F.Supp.2d 512 (S.D.N.Y.2003), the court dismissed the plaintiffs' "deceptive omission" consumer fraud claims because "one necessary element of any potentially viable claim must be that McDonalds' products involve a danger that is not within the common knowledge of consumers." *Id.* at 518. Defendant also cites a number of tobacco-related cases that support its contention. *See, e.g., American Tobacco Co., Inc. v. Grinnell,* 951 S.W.2d 420, 429 (Tex.1997) ("We conclude that the general health dangers attributable to cigarettes were commonly known as a matter of law when [plaintiff] began smoking.").

In sum, Defendant argues that the dangers of excessive UV-based tanning are common knowledge, and thus, there is no duty to disclose this information under the CFA. Since there is no duty to disclose, Defendant contends that there can be no "knowing omission" liability, and Plaintiff's CFA claim should be dismissed. Defendant concludes by addressing Plaintiff's claims that there is no such thing as a "safe tan," emphasizing that there is currently a debate regarding the harms and benefits of indoor tanning, and the scientific evidence is inconclusive.

Plaintiff argues that the issue, whether the effects of "excessive" exposure is common knowledge, has no bearing on this case. First, Nafar emphasizes that *any* exposure to UV rays is harmful; exposure need not be "excessive." Second, Nafar points out that even Hollywood Tans is under the impression that the dangers of tanning are minimal and that there are an abundance of therapeutic benefits to sunless tanning. Plaintiff emphasizes that the ill effects of *any* exposure to UV rays is *not* common knowledge because even Hollywood Tans fails to recognize that *any* exposure is harmful. Because the effects of exposure to UV rays are not common knowledge, and because the average consumer would consider such information material to their decision to purchase such services, Defendant is required to provide these facts to consumers in order to avoid a fraud action.

**\*8** This Court cannot, at the pleading stage and before discovery, determine as a matter of law "what the average consumer knows or should know." Plaintiff notes that judgment on the pleadings is only proper where the material facts are not in dispute, and in this case, the average consumer's knowledge of the harmful effects of indoor tanning is a disputed issue.

A Rule 12(c) motion is governed by the same standard as a Rule 12(b)(6) Motion to Dismiss for Failure to State a Claim, which includes a prohibition against considering evidence beyond the pleadings. *See Mele v. Federal Reserve Bank of New York,* 359 F.3d 251, 257 (3d Cir.2004).

In *Cippolone,* 893 F.2d 54, the Third Circuit held that whether the dangerous characteristics of cigarettes are known to the average consumer is an issue of fact for the jury. Nafar goes on to contend that the "common knowledge" test should not be read into the CFA. The purpose of the CFA is to prevent fraud or deception by acts of commission or omission. *See Fenwick v. Kay American Jeep, Inc.,* 72 N.J. 372, 376-77 (1999). Plaintiff argues that reading the common knowledge test into the CFA would be in contravention of the statute, emphasizing that the CFA is remedial and should be liberally construed to protect consumers.

Under the CFA, the "omission, of any material fact with intent that others rely upon such concealment ..." is unlawful. N.J.S .A. § 56:8-2. Hollywood Tans argues that it is only required to disclose information if it has a "duty to disclose," and the recognition of a legal duty is a question of law. In doing so, Hollywood Tans conflates a "duty to disclose" with the issue of materiality.

For Plaintiff to succeed on her CFA claim, she has the burden of demonstrating that the ill effects of tanning are "material facts," facts that would be important to a consumer's decision whether or not to purchase Defendant's product. It is the materiality of those facts, the ill effects of tanning, which is at issue. The ill effects of tanning would not be material if the average consumer knows about these ill effects, and this information *would be material* if the average consumer does not know about the ill effects. Determining the materiality of a misrepresentation or omission is a question of fact, not a question of law.

Because both parties dispute the very existence of any ill effects related to tanning, this is an issue to be resolved at trial. At this pleading stage, all disputed issues of material fact are resolved in favor of the non-moving party.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1101440 (D.N.J.)
**(Cite as: 2007 WL 1101440 (D.N.J.))**

**IV. CONCLUSION**

For the reasons stated, it is the finding of this Court that Defendant's motion for partial judgment on the pleadings is **denied** . An appropriate Order accompanies this Opinion.

D.N.J.,2007.
Nafar v. Hollywood Tanning Systems, Inc.
Not Reported in F.Supp.2d, 2007 WL 1101440 (D.N.J.)

END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2008 WL 4192065 (D.N.J.)
**(Cite as: 2008 WL 4192065 (D.N.J.))**

**C**Only the Westlaw citation is currently available.NOT FOR PUBLICATION

United States District Court,
D. New Jersey.
VISUAL INTERACTIVE PHONE CONCEPTS,
INC., Plaintiff,
v.
VIRGIN MOBILE USA, Defendant.
**Civil Action No. 05-2661 (MLC).**

Sept. 8, 2008.

Jean-Marc Zimmerman, Zimmerman, Levi & Korsinsky LLP, Westfield, NJ, Mark L. Hankin, Hankin, Handwerker & Mazel, PC, New York, NY, for Plaintiff.

Cynthia V. Fitzgerald, Robert J. Del Tufo, William F. Clarke, Jr., Skadden, Arps, Slate, Meagher & Flom, LLP, New York, NY, for Defendant.

**MEMORANDUM OPINION**

COOPER, District Judge.

*1 Plaintiff, Visual Interactive Phone Concepts, Inc. ("VIPC"), alleges claims of infringement of U.S. Patent No. 5,606,361 (the "'361 Patent") and U.S. Patent No. 5,724,092 (the "'092 Patent") (collectively, the "patents-in-suit") against defendant, Virgin Mobile USA ("VMU"). (Dkt. entry no. 1, Compl.) VMU asserts counterclaims against VIPC for judgments declaring non-infringement and invalidity of the patents-in-suit. (Dkt. entry no. 3, Ans. & Countercl.) VMU now moves for summary judgment in its favor pursuant to Federal Rule of Civil Procedure ("Rule") 56(c). (Dkt. entry no. 83.) VIPC opposes the motion. (Dkt. entry no. 91.) For the reasons stated herein, the Court will grant the motion.[FN1]

> FN1. The Court held oral argument on this motion on August 20, 2008. Because no party has ordered a transcript of the oral argument, the Court will cite to that oral argument as "8-20-08 Oral Arg."

**BACKGROUND**

VIPC brought this action against VMU on May 20, 2005. (Dkt. entry no. 1.) On September 29, 2005, VMU served its first set of requests for production of documents to VIPC. (Dkt. entry no. 85, Decl. of Cynthia V. Fitzgerald ("Fitzgerald Decl."), Ex. A, First Set of Requests for Produc. of Docs.) VMU requested, *inter alia*, all documents relating to (1) "the ownership, assignment, or other transfer of ownership of the patents-in-suit", and (2) "any offers to license or licenses regarding any of the patents-in-suit". (*Id.*, Ex. A, First Set of Requests for Produc. of Docs., at 8.) VMU also served its first set of interrogatories to VIPC on September 29, 2005. (*Id.*, Ex. B, First Set of Interrogs.) VMU asked VIPC to, *inter alia*, "[i]dentify all license agreements, settlements, covenants not to sue, and any negotiations thereto, that relate to the patents-in-suit". (*Id.*, Ex. B, First Set of Interrogs., at 11.)

VIPC responded to the requests for production of documents and interrogatories by identifying, *inter alia*, a license agreement between VIPC and HandTrade.Com, Inc. ("HandTrade"), executed in 1999 (the "Non-Exclusive Agreement"). (*Id.*, Ex. C, Resp. to First Set of Interrogs., at 7-8.) VIPC also identified an action in New York state court involving VIPC and HandTrade. (*Id.*, Ex. C, Resp. to First Set of Interrogs., at 7.) This action was brought by VIPC against HandTrade on June 22, 2005, alleging breach of contract based on the Non-Exclusive Agreement ("First New York Action"). (*See* dkt. entry no. 92, 3-24-08 Certification of Mark L. Hankin ("3-24-08 Hankin Cert."), Ex. 16, First New York Action Compl.) Mark L. Hankin ("Hankin"), VIPC's counsel in this action, signed and submitted the First New York Action complaint. (*Id.*) VIPC has not amended or supplemented this response. (Dkt. entry no. 84, VMU Br., at 4.)

VMU deposed Anthony J. Cinotti ("Cinotti"), a former officer of VIPC, on February 8, 2007. (*Id.*)[FN2] In connection with this deposition, VMU received a copy of a document entitled "Amended And Restated License Agreement And Exclusive License Agreement Between HandTrade.Com, Inc. And Visual Interactive Phone Concepts, Inc.", dated August 10,

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4192065 (D.N.J.)
(Cite as: 2008 WL 4192065 (D.N.J.))

2000 (the "Exclusive Agreement"). (*Id.;* Fitzgerald Decl., Ex. D, Exclusive Agreement.) The Exclusive Agreement was executed by Cinotti, and, *inter alia,* granted HandTrade the (1) exclusive right to use the technology claimed in the patents-in-suit, and (2) right to sue for infringement of the patents-in-suit. (Fitzgerald Decl., Ex. D, Exclusive Agreement.)

> FN2. Cinotti was the person who first revealed to VMU that there was an Exclusive Agreement pertaining to the patents-in-suit. (VMU Br., at 4-5.) This revelation was made when VMU subpoenaed and deposed Cinotti. (*Id.*) Cinotti is not a party in this action. Cinotti is a co-inventor of the patents-in-suit, and is formerly an officer, and currently a director, of VIPC. (Fitzgerald Decl., Ex. C, Resp. to First Set of Interrogs., at 5; VMU Br., at 33-34.) In April 2000, a dispute arose between Cinotti and John Davidsohn ("Davidsohn"), who is the other co-inventor of the patents-in-suit and is the current chief executive officer of VIPC. (Fitzgerald Decl., Ex. C, Resp. to First Set of Interrogs., at 5; VIPC Br., at 9.) That dispute concerned election of officers and control over VIPC, and was heavily litigated through the appeals level in New York state court. (VIPC Br., at 8-9; dkt. entry no. 95, VMU Reply Br., at 8.) During Davidsohn's deposition in this action, taken on October 10, 2006 ("10-10-06 Davidsohn Deposition Testimony"), Davidsohn testified that he did not "know where Cinotti" was, and that he had a "skip tracer looking for him". (10-10-06 Davidsohn Dep. Test., at 87.) He further testified that he had "a subpoena out against Cinotti". (*Id.* at 103.) However, VMU's counsel stated at oral argument that VMU was able to locate and depose Cinotti without difficulty. (8-20-08 Oral Arg.) Davidsohn's deposition testimony as to Cinotti's whereabouts is relevant to the Court's determination of bad faith, discussed *infra,* because it was only by contacting and deposing Cinotti that VMU learned that the Exclusive Agreement existed. (VMU Br., at 4-5.)

**\*2** VMU then moved for summary judgment in its favor on April 9, 2007, arguing that, *inter alia,* the Exclusive Agreement divested VIPC of standing to

bring this action. (Dkt. entry no. 48, VMU Br. in Support of 4-9-07 Mot. for Summ. J.) FN3 VIPC opposed the motion, arguing that, *inter alia,* the Exclusive Agreement was invalid as a matter of law. (Dkt. entry no. 58, 4-24-07 VIPC Opp. Br. to 4-9-07 Mot. For Summ. J.) VIPC's papers in opposition to this motion were submitted by Hankin. (*See* dkt. entry nos. 57-60.)

> FN3. VMU first moved for summary judgment on February 23, 2007. (Dkt. entry no. 21, 2-23-07 VMU Mot. for Summ. J.) VIPC opposed that motion. (Dkt. entry no. 37, 3-26-07 VIPC Opp. Br. to 2-23-07 VIPC Mot. for Summ. J. ("3-26-07 VIPC Br.").) However, the Court denied that motion because of technical deficiencies on May 10, 2007. (Dkt. entry no. 64, 5-10-07 Order.)

While this motion was pending, VMU independently learned that VIPC had brought another action in New York state court against HandTrade on March 11, 2007 (the "Second New York Action"). (VMU Br., at 5-6; *see* Fitzgerald Decl., Ex. E, Second New York Action Compl.) VIPC did not inform VMU or the Court of the Second New York Action. (VMU Br., at 5.) In the Second New York Action, VIPC alleged that, *inter alia,* (1) it entered into the Exclusive Agreement with HandTrade, and (2) HandTrade breached the Exclusive Agreement by failing or refusing to pay the royalties and minimum license fees required under it. (Fitzgerald Decl., Ex. E, Second New York Action Compl.) VIPC thus requested, *inter alia,* a judgment (1) declaring a breach of the Exclusive Agreement by HandTrade, resulting in termination of the Exclusive Agreement, (2) in the sum of $300,000, "plus the value of 3,250,000 of the common stock of" HandTrade due under the Exclusive Agreement, and accrued interest, (3) requiring an accounting of HandTrade's book and records to determine gross revenue received under the Exclusive Agreement, and (4) for royalties under the Exclusive Agreement in an amount of one percent of all gross revenues, and accrued interest. (*Id.*) Hankin signed and submitted this complaint. (*Id.*)

VMU informed the Court of the Second New York Action on June 1, 2007, attaching a copy of the Second New York Action complaint. (Dkt. entry no. 67, 6-1-07 VMU Letter to Court.) Hankin responded to this letter, stating that, *inter alia,* the "non-validity [of

Not Reported in F.Supp.2d, 2008 WL 4192065 (D.N.J.)
(Cite as: 2008 WL 4192065 (D.N.J.))

the Exclusive Agreement] had never been an issue", and that "a decision was made by [VIPC] to obtain a judicial declaration in the State of New York terminating the said alleged [Exclusive] Agreement for all purposes". (Dkt. entry no. 69, 6-4-07 Hankin Letter to Court.)

VIPC received a default judgment in the Second New York Action against HandTrade in an order dated August 17, 2007. (Fitzgerald Decl., Ex. F, Second New York Action 8-17-07 Order.) The court in the Second New York Action also ordered that a damages inquest would be conducted before the Honorable Lester Sacks, a New York Judicial Hearing Officer (the "JHO"). (*Id.; VMU Br.*, at 6.) On August 31, 2007, this Court, *inter alia,* (1) denied VMU's first motion for summary judgment without prejudice, and (2) stayed this action for ninety days pending the outcome of the Second New York Action. (Dkt. entry no. 76, 8-31-07 Order.)

*3 Hankin then filed a "Notice For Inquest/Trial" in the Second New York Action on September 4, 2007. (Fitzgerald Decl., Ex. G, Second New York Action Notice For Inquest/Trial.) VIPC requested, *inter alia,* a judgment (1) "declaring a breach of the [Exclusive Agreement] by [HandTrade] resulting in the termination of [the Exclusive Agreement]", (2) "in the sum of $300,000.00 plus value of $3,250.00 of the common stock of [HandTrade] due [and] owing under the [Exclusive Agreement] to [VIPC] from [HandTrade] plus accrued interest", (3) "requiring an accounting of [HandTrade's] books and records for the period of August 10, 2000 through the present to determine gross revenue received under the [Exclusive Agreement]", and (4) "for royalties under the [Exclusive Agreement] in an amount of one (1%) percent of all gross revenues, plus accrued interest". (*Id.*)

The JHO entered a Decision and Order, dated October 9, 2007, stating that, *inter alia,* the Exclusive Agreement was not "renewed by proper authority" and thus "the alleged renewal was void 'ab initio' " ("Second New York Action 10-9-07 Decision and Order"). (Fitzgerald Decl., Ex. H, Second New York Action 10-9-07 Decision and Order.) In reaching this decision, the JHO relied on the testimony of Davidsohn, noting that "[n]o proof ha[d] been presented to contradict" his testimony. (*Id.*) On November 14, 2007, the court in the Second New York Action ordered and adjudged that (1) the Exclusive Agreement

was "void as a matter of law as of the date of execution for lack of authority", and (2) because the Exclusive Agreement was "void ab initio, no damage award" was rendered ("Second New York Action Judgment"). (Fitzgerald Decl., Ex. I, Second New York Action Judgment.)

VIPC thereafter requested that the Court place this action "on the calendar", stating that the Second New York Action Judgment showed that the Exclusive Agreement was invalid, and thus, VIPC had standing to bring this action. (Dkt. entry no. 78, 1-8-08 VIPC Letter to Court; dkt. entry no. 79, First 1-10-08 VIPC Letter to Court; dkt. entry no. 80, Second 1-10-08 VIPC Letter to Court.) The Magistrate Judge then granted VMU permission to move again for summary judgment in its favor. (Dkt. entry no. 82, 2-5-08 Letter Order.) VMU again moved for summary judgment in its favor on February 22, 2008. (Dkt. entry no. 83.) VIPC opposes the motion. (Dkt. entry no. 91.)

## DISCUSSION

### I. Summary Judgment Standard

Rule 56(c) provides that summary judgment is proper if the pleadings, the discovery and disclosure materials, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. *Id.* The summary judgment movant bears the initial burden of showing that there is no genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the movant has met this prima facie burden, the non-movant must set out specific facts showing that there is a genuine issue for trial. *Fed.R.Civ.P. 56(e)(2).* A non-movant must present actual evidence that raises a genuine issue of material fact and may not rely on mere allegations. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

*4 The Court must view the evidence in the light most favorable to the non-movant when deciding a summary judgment motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). At the summary judgment stage, the Court's role is "not ... to weigh the evidence and determine the truth of the matter but

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

to determine whether there is a genuine issue for trial." *Anderson,* 477 U.S. at 249. Under this standard, the "mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient [to defeat a <u>Rule 56(c)</u> motion]; there must be evidence on which the jury could reasonably find for the [non-movant]." *Id.* at 252. "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id.* at 247-48 (emphasis in original). A fact is material only if it might affect the action's outcome under governing law. *Id.* at 248. "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (internal citations omitted).

## II. Judicial Estoppel

### A. Legal Standard

Judicial estoppel bars a litigant from asserting a position that is inconsistent with one that the litigant previously took before a court. *Taylor v. Mooney Aircraft Corp.,* 265 Fed.Appx. 87, 92 (3d Cir.2008). It applies to assertions of both factual and legal positions, and may be applied based on the assertion of a party or a party's counsel. *AFN, Inc. v. Schlott, Inc.,* 798 F.Supp. 219, 224 (D.N.J.1992). "Thus, a position taken or a representation made by counsel in a legal brief or in argument to the court may provide a basis for estoppel." *Id.* However, "judicial estoppel is an extreme remedy, to be used only when the inconsistent positions are tantamount to a knowing misrepresentation to or even fraud on the court". *Chao v. Roy's Constr., Inc.,* 517 F.3d 180, 186 n. 5 (3d Cir.2008) (quotation and citations omitted).

For the Court to apply judicial estoppel against a litigant, (1) the litigant must have taken two positions that are irreconcilably inconsistent, (2) the litigant must have changed the position in bad faith, or "with intent to play fast and loose with the court", and (3) no lesser sanction would adequately remedy the damage done by the litigant's misconduct. *Taylor,* 265 Fed.Appx. at 92 (quotations and citation omitted). The Court also may consider other factors in deter-

mining whether to apply judicial estoppel, such as whether the litigant (1) succeeded in convincing a tribunal to accept the position, and (2) would derive an unfair advantage in the absence of estoppel. *Chao,* 517 F.3d at 186 n. 5.[FN4]

> FN4. VIPC cites to *Zenith Laboratories, Inc. v. Bristol Myers Squibb Co.,* No. 91-3423, 1991 WL 267892, at *11 (D.N.J. Dec.12, 1991), for the proposition that there is a 'requirement that a party must 'successfully' assert a legal position in one proceeding to be barred from asserting an inconsistent position in a latter proceeding" for judicial estoppel to apply. (Dkt. entry no. 91, VIPC Br., at 16-17.) This is incorrect. As noted *supra,* whether a litigant has successfully asserted a legal position is merely a factor in the Court's judicial estoppel determination. *See Chao,* 517 F.3d at 186 n. 5; *see also AFN, Inc.,* 798 F.Supp. at 225 (noting that the "integrity of the judicial process can be sorely compromised short of inconsistent results ... [i]ndeed, if what is at issue is the integrity of the court, whether a court is asked to rely or has in fact relied on a prior inconsistent position should be a distinction without a difference.")

### B. Legal Standard Applied Here

*5 VMU contends that the Court should apply judicial estoppel against VIPC here, as (1) VIPC has advanced two irreconcilably inconsistent positions, (2) VIPC has acted in bad faith, and (3) no lesser sanction than summary judgment would right the wrongs VIPC has committed. (VMU Br., at 11-16.) This Court agrees, and will grant VMU's motion on the basis of judicial estoppel.

VIPC has advanced two irreconcilably inconsistent positions here. In this action, VIPC and Hankin have repeatedly asserted or argued that the Exclusive Agreement is invalid as a matter of law. (*See, e.g.,* VIPC Br., at 8-15; dkt. entry no. 34, 3-26-07 Aff. of John Davidsohn ("3-26-07 Davidsohn Aff."), at ¶ 34; dkt. entry no. 35, 3-26-07 Decl. of Mark L. Hankin ("3-26-07 Hankin Decl."), at ¶ 15; 3-26-07 VIPC Br., at 1; dkt. entry no. 57, Aff. of John Davidsohn ("4-24-07 Davidsohn Aff."), at ¶ 49; dkt. entry no. 58, 4-24-07 Decl. of Mark L. Hankin ("4-24-07 Hankin

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4192065 (D.N.J.)
**(Cite as: 2008 WL 4192065 (D.N.J.))**

Decl."), at ¶ 8.) However, while this action was ongoing, VIPC also brought the Second New York Action on March 11, 2007, asserting that, *inter alia,* (1) "on or about August 10, 2000, [VIPC and HandTrade] entered into a licensing agreement wherein [VIPC] granted a license to [HandTrade] for use of the [patents-in-suit]", (2) HandTrade "was required to pay" royalties and maintenance fees to VIPC under that agreement, (3) HandTrade's failure to pay the royalties and maintenance fees was "a complete breach of contract", and (4) VIPC was owed damages as a result of that breach. (Fitzgerald Decl., Ex. E, Second New York Action Compl.) Thus, in the Second New York Action, VIPC not only asserted that the Exclusive Agreement existed and was valid, but also sought damages for a breach of that agreement. (*See id.*) These two positions are irreconcilably inconsistent. *See AFN, Inc.,* 798 F.Supp. at 222-23, 227 (judicially estopping litigant from asserting that contract was illegal, as litigant asserted breach of and sought damages under contract in earlier court action).

VIPC contends that it has neither asserted nor argued that the Exclusive Agreement was valid. (VIPC Br., at 16-17.) It explains that upon learning of the existence of the Exclusive Agreement, it sought to terminate it in the Second New York Action, and merely "inadvertently" pled a breach of contract action. (*Id.*) It explains this inadvertence by stating that it utilized the same complaint filed in the First New York Action. (*Id.* at 3.) It further states that the court in the Second New York Action "determined based on [Davidsohn's] testimony that the Exclusive Agreement was void ab initio for lack of authority ... [a]s such, the pleading defect was excused and the complaint amended to conform to the proof". (*Id.* at 16-17.)

This Court finds that VIPC did not merely "inadvertently" plead the Second New York Action as a breach of contract action. The complaints filed in the First New York Action and the Second New York Action seek different damages for breaches of different agreements. (*See* 3-24-08 Hankin Cert., Ex. 16, First New York Action Compl.; Fitzgerald Decl., Ex. E, Second New York Action Compl.) Further, as noted *supra,* the Notice For Inquest/Trial filed in the Second New York Action on September 4, 2007, again requested, on behalf of VIPC, a judgment (1) "declaring a breach of the [Exclusive Agreement] by [HandTrade] resulting in the termination of [the Ex-

clusive Agreement]", (2) "in the sum of $300,000.00 plus value of $3,250.00 of the common stock of [HandTrade] due [and] owing under the [Exclusive Agreement] to [VIPC] from [HandTrade] plus accrued interest", (3) "requiring an accounting of [HandTrade's] books and records for the period of August 10, 2000 through the present to determine gross revenue received under the [Exclusive Agreement]", and (4) "for royalties under the [Exclusive Agreement] in an amount of one (1%) percent of all gross revenues, plus accrued interest". (Fitzgerald Decl., Ex. G, Second New York Action Notice For Inquest/Trial.) Moreover, in a letter to the Court dated August 30, 2007, Hankin represented that VIPC's decision to plead a breach of contract in the Second New York Action was deliberate, as VIPC "took the alternative position" to plead breach of contract so "that if the [Exclusive] Agreement was found valid ... its termination was required". (Dkt. entry no. 75, 8-30-07 Hankin Letter to Court.) Thus, it is apparent that VIPC did not "inadvertently" assert that the Exclusive Agreement was valid in the Second New York Action.

*6 This Court also finds that VIPC and Hankin acted in bad faith in asserting these two irreconcilably inconsistent positions. As noted *supra,* Hankin filed the Second New York Action Complaint on March 11, 2007, where VIPC alleged that HandTrade breached the Exclusive Agreement. (*See* Fitzgerald Decl., Ex. E, Second New York Action Compl.) Only fifteen days later, on March 26, 2007, Hankin submitted papers to this Court repeatedly representing that the Exclusive Agreement was a "nullity" and "void". (*See, e.g.,* 3-26-07 Davidsohn Aff., at ¶ 34; 3-26-07 Hankin Decl., at ¶ 15; 3-26-07 VIPC Br., at 1.)

VIPC admitted at oral argument, moreover, that it did not inform VMU or the Court of the Second New York Action. (8-20-08 Oral Arg.) Rather, it was only through VMU's independent investigation that VMU learned of the Second New York Action and subsequently informed the Court of it as well. (VMU Br., at 5; 6-1-07 VMU Letter to Court .) VIPC's failure to disclose the Second New York Action violated the continuing duty of disclosure. *See* Fed.R.Civ.P. 26(e)(1) (A). This failure is especially egregious considering that Hankin has acted as VIPC's counsel throughout this litigation, as well as in the First New York Action and Second New York Action.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4192065 (D.N.J.)
(Cite as: 2008 WL 4192065 (D.N.J.))

Bad faith also is demonstrated by the deliberate withholding of the Exclusive Agreement from VMU and this Court, which also violates the continuing duty of disclosure. *See* Fed.R.Civ.P. 26(e)(1) (A). As noted *supra,* VMU only learned of the Exclusive Agreement when it deposed Cinotti on February 8, 2007. (VMU Br., at 4.) VIPC claims that it did not know the Exclusive Agreement existed before that deposition, stating that the fact that VIPC brought the First New York Action supports this assertion, as "[c]learly, had [VIPC] known that [the Exclusive Agreement] existed, there would be no need for the termination of the former Non-Exclusive Agreement". (VIPC Br., at 2-3.) Hankin also claimed at oral argument that neither he nor Davidsohn were aware of the existence of the Exclusive Agreement until Cinotti's deposition. (8-20-08 Oral Arg.)

This assertion is flatly contradicted by Hankin's earlier submissions, as well as other evidence in the record. Davidsohn's affidavit, submitted to the Court on March 26, 2007, states that, *inter alia,* (1) "on *September 12, 2000,* Cinotti obtained written consent(s) of certain shareholders ... to ratify the Exclusive Agreement with Handtrade dated August 10, 2000", and (2) "on *October 2, 2000,* Cinotti commenced an action in District Court, Clark County Nevada ... for a Judicial Declaration that the ... ratification of the Exclusive Agreement held on September 12, 2000, was valid". (3-26-07 Davidsohn Aff., at ¶¶ 18-19 (emphasis in original).) The Court will hereinafter refer to that action as the "Nevada Action".[FN5] At oral argument, Hankin stated that he did not know whether Davidsohn was ever served with the complaint in the Nevada Action, so as to make Davidsohn aware of the existence of the Exclusive Agreement around October 2, 2000, well before Cinotti was deposed on February 8, 2007. (8-20-08 Oral Arg.) However, VMU provided this Court with a copy of the docket in the Nevada Action. (8-21-08 VMU Letter to Court, Ex., Nevada Action Docket.) That docket provides that both VIPC and Davidsohn were parties to that action, and that Davidsohn answered the complaint on November 22, 2000. (*Id.*)[FN6] Thus, Davidsohn was aware of the existence of the Exclusive Agreement over six years before Cinotti's deposition in this action occurred.[FN7]

FN5. The Court notes that VIPC did not disclose the Nevada Action in its response to VMU's requests for production of documents and interrogatories. (*See* Fitzgerald Decl., Ex. C, Resp. to First Set of Interrogs., at 6-7.) VIPC's failure to disclose the Nevada Action also violated the continuing duty of disclosure. *See* Fed .R.Civ.P. 26(e)(1)(A).

FN6. The Court notes that this evidence also contradicts Davidsohn's testimony in the 10-10-06 Davidsohn Deposition Testimony, where he testified that he was aware of only one agreement between VIPC and Hand-Trade, the Non-Exclusive Agreement. (10-10-06 Davidsohn Dep. Test., at 60, 72, 84.) However, Davidsohn's testimony as to this issue is unclear at best. (*See id.* at 84 (stating that "Cinotti had given another-expanded on the [Non-Exclusive Agreement]. But he wasn't capable of expanding on the [Non-Exclusive Agreement] because he would need board approval; and that would be me, and I never approved anything. So the only license they had was the one license that I know of".)

FN7. The Court notes that Davidsohn's testimony as to his knowledge of the whereabouts of documents pertaining to VIPC in general is somewhat dubious. For example, in the 10-10-06 Davidsohn Deposition Testimony, Davidsohn testified that sometime after 2001, "all sorts of corporate files" were "put in a storehouse", but that he didn't "know the name of" the place the files were stored because "they moved". (10-10-06 Davidsohn Dep. Test., at 160-61, 165.) Davidsohn further testified that these files were "destroyed", as they somehow became "water-damaged" and "moldy". (*Id.* at 161, 171-72.)

*7 The Court further notes that VIPC has misled this Court as to the threshold, dispositive issue of standing in this action by not disclosing the existence of the Exclusive Agreement. It is VIPC's burden to establish that it had standing to bring a suit alleging patent infringement when it brought this action. *See Paradise Creations, Inc. v. UV Sales, Inc.,* 315 F.3d 1304, 1309 (Fed.Cir.2003) (noting that "in order to assert standing for patent infringement, the plaintiff must demonstrate that it held enforceable title to the

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4192065 (D.N.J.)
(Cite as: 2008 WL 4192065 (D.N.J.))

patent *at the inception of the lawsuit"* ) (emphasis in original); *Rite Hite Corp. v. Kelley Co., Inc.,* 56 F.3d 1538, 1551 (Fed.Cir.1995) (noting that "question of standing to sue" for patent infringement "is a jurisdictional one"). Further, in a patent infringement case, only "[a] patentee shall have remedy by civil action for infringement of his patent." 35 U.S.C. § 281; *Paradise Creations, Inc.,* 315 F.3d at 1308. Exclusive licensees holding all substantial rights to a patent meet this standard. *Id.* Thus, if the Exclusive Agreement is valid and enforceable, HandTrade may qualify as an exclusive licensee of the patents-in-suit so as to divest VIPC of standing to bring this action. *See id.*

Resolving this issue would require extensive litigation in an action that has been ongoing for over three years. The Court would have to trace the chain of title of the patents-in-suit as between VIPC and Hand-Trade, and determine whether the Exclusive Agreement is valid and enforceable. *See, e.g., Fitroil, N.A., Inc. v. Maupin,* No. 98-1212, 1998 WL 851131, at *1-*3 (Fed.Cir. Dec.3, 1998) (analyzing evidence involving assignment of patent at issue, and determining that no party in the litigation had been shown to be owner of patent); *Gaia Techs., Inc. v. Reconversion Techs., Inc.,* 93 F.3d 774, 778-80 (Fed.Cir.1996) (noting that (1) "[i]n order to adjudicate" the standing issue, it had to "trace the chain of title" of the patents and trademarks at issue, and (2) "several pieces of evidence in the record" were "relevant to determining" ownership), *amended on reh'g in part by,* 104 F.3d 1296 (Fed.Cir.1996).[FN8] Thus, VIPC has not only failed to meet its burden to establish standing; the deliberate and misleading conduct by VIPC and Hankin also has prevented this Court from resolving a threshold, dispositive issue in a timely and efficient manner.[FN9]

> FN8. Contrary to VIPC's assertions, the Second New York Action Judgment could not be used to collaterally estop VMU from litigating the issue of whether the Exclusive Agreement is valid and enforceable. (*See* VIPC Br., at 19-20.) New York law would apply to this issue, because this Court must give a state court judgment the same preclusive effect as would be given the judgment under the law of the state in which the judgment was rendered. *Migra v. Warren City Sch. Dist. Bd. of Educ.,* 465 U.S. 75, 81,

104 S.Ct. 892, 79 L.Ed.2d 56 (1984); *Walker v. Horn,* 385 F.3d 321, 337 (3d Cir.2004). Under New York law, because VMU was neither a party nor in privity with a party to the Second New York Action, the doctrine of collateral estoppel could not be applied against it. *See Howard v. Town of Bethel,* 481 F.Supp.2d 295, 301 (S.D.N.Y.2007) (applying New York law).

> FN9. Whether a plaintiff has standing to bring this action is a question of law to be determined by the Court, not a question of fact for a jury. *Advanced Cardiovascular Sys., Inc. v. Medtronic Vascular, Inc.,* 485 F.Supp.2d 519, 532 (D.Del.2007).

No lesser sanction would adequately remedy the damage done by the misconduct here. *See AFN, Inc.,* 798 F.Supp. at 227 (judicially estopping litigant from asserting that contract was illegal, and stating that "[i]n furtherance of the broader policy of protecting the integrity of the court and the judicial system, no further judicial aid will be given this particular enterprise of blowing hot and cold as the occasion demands") (quotation and citation omitted).

The prejudice suffered by VMU is overwhelming here, moreover. VMU, at its own expense, has been forced to discover information concerning a dispositive issue in this action which VIPC had a duty to disclose to VMU and this Court. Indeed, at oral argument, VMU's counsel stated that VMU's legal fees in defending this action have reached at least $1 million thus far. (8-20-08 Oral Arg.) These legal fees would undoubtedly increase if VMU were subjected to additional discovery to resolve the issue of VIPC's standing, an issue which, as discussed *supra,* was VIPC's burden to establish. The Court will not subject VMU to extended litigation to resolve this issue when VIPC and Hankin have misled the Court and VMU as to this issue since the inception of this action.[FN10] Therefore, because (1) VIPC and Hankin have advanced two irreconcilably inconsistent positions, (2) VIPC and Hankin have acted in bad faith, and (3) no lesser sanction would remedy the damage done here, the Court concludes that this is the rare case where judicial estoppel should be applied so as to render judgment against VIPC. Thus, the Court will grant VMU's motion on that basis.[FN11]

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4192065 (D.N.J.)
**(Cite as: 2008 WL 4192065 (D.N.J.))**

FN10. The Court may decline to resolve the issue of standing here, as it "has leeway to choose among threshold grounds for denying audience to a case on the merits". *Sinochem Int'l Co. Ltd. v. Malaysia Int'l Shipping Corp.,* --- U.S. ----, ----, 127 S.Ct. 1184, 1191, 167 L.Ed.2d 15 (2007) (quotation and citations omitted); *Agcaoili v. Wiersielis,* 273 Fed.Appx. 138, 138-39 (3d Cir.2008) (noting same); *Gonzalez-Cifuentes v. I.N.S.,* 253 Fed.Appx. 173, 175-76, n. 2 (3d Cir.2007) (affirming decision of district court dismissing action on grounds of res judicata, and stating that it need not decide whether it lacked subject matter jurisdiction, as it did not reach merits of case). The Court is not reaching the merits of the parties' claims here; therefore, it need not address the issue of standing. *See Sinochem Int'l Co. Ltd.,* 127 S.Ct. at 1191; *Gonzales-Cifuentes,* 253 Fed.Appx. at 175 n. 2.

FN11. The Court notes that granting VMU's motion leaves VIPC in no worse position than when it brought this action, because the status of the ownership of the patents-in-suit remains unresolved, as it was when VIPC brought this action.

## CONCLUSION

*\*8* For the reasons stated *supra,* the Court will grant the motion. The Court will issue an appropriate order and judgment.

D.N.J.,2008.
Visual Interactive Phone Concepts, Inc. v. Virgin Mobile USA
Not Reported in F.Supp.2d, 2008 WL 4192065 (D.N.J.)

END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2007 WL 87633 (D.N.J.)
**(Cite as: 2007 WL 87633 (D.N.J.))**

☛Only the Westlaw citation is currently available.NOT FOR PUBLICATION

United States District Court,
D. New Jersey.
Deborah FELLNER, Individually and on Behalf of
Those Similarly Situated, Plaintiffs,
v.
TRI-UNION SEAFOODS, L.L.C., d/b/a: Chicken of
the Sea, Defendant.
**Civil Action No. 06-CV-0688 (DMC).**

Jan. 9, 2007.

<u>Barry R. Eichen</u>, Eichen Levinson, LLP, Edison, NJ,
for Plaintiffs.

<u>Kenneth Andrew Schoen</u>, Bonner, Kiernan, Trebach
& Crociata, Parsippany, NJ, for Defendant.

**OPINION**

<u>DENNIS M. CAVANAUGH</u>, U.S. District Judge.

**\*1** This matter comes before the Court on motion by
Tri-Union Seafoods, L.L.C. ("Defendant") to dismiss
the complaint of Deborah Fellner ("Plaintiff") and
motion requesting judicial notice in support of its
motion to dismiss. For the reasons set forth below,
Defendant's motions are **granted.**

**BACKGROUND**

Plaintiff's Complaint alleges violations of the New
Jersey Products Liability Act, N.J.S.A. 2A-58C-1, *et
seq.,* ("NJPLA"), the New Jersey Consumer Fraud
Act, <u>N.J.S.A. 56:8-1, *et seq.*</u> ("NJCFA") and common
law fraud for failing to warn the public that consump-
tion of Defendant's tuna, purportedly containing me-
thylmercury, could result in <u>mercury poisoning</u>.
Plaintiff states that her diet consisted "almost exclu-
sively" of canned tuna for five years between 1999
and 2004. She has been diagnosed with <u>mercury poi-
soning</u>.

Defendant moves for dismissal, arguing that (1) the
United States Food and Drug Administration
("FDA") preempts state law in the areas of establish-
ing the maximum allowable concentration of me-
thylmercury in fish and of warning consumers about
the potential effects of methylmercury in tuna when
consumed; (2) Defendant is not liable under New
Jersey law for injuries incurred by Plaintiff for ab-
normal consumption of its product; (3) New Jersey
law does not impose a duty upon Defendant to warn
potential plaintiffs about a product that may be dan-
gerous only if over-consumed; and (4) Plaintiff's
claim for common law fraud is subsumed by the
NJPLA.

**DISCUSSION**

*Motion Requesting Judicial Notice*

In support of its motion to dismiss, Defendant re-
quests that this Court take judicial notice of several
publicly available reports and articles on methylmer-
cury in fish. The reports are as follows:

• "What You Need to Know About Mercury in Fish
and Shellfish," published by the United States De-
partment of Health and Human Services and the
United States Environmental Protection Agency.

• "Backgrounder for the 2004 FDA/EPA Consumer
Advisory: What You Need to Know About Mer-
cury in Fish and Shellfish," published by the
United States Department of Health and Human
Services ("DHHS") and the United States Envi-
ronmental Protection Agency. ("EPA").

• Letter from Lester M. Crawford, D.V.M., Ph.D.,
United States Commissioner of Food and Drugs, to
Bill Lockyer, Attorney General of the State of Cali-
fornia, dated August 12, 2005, re: a suit filed on
June 21, 2004 in San Francisco Superior Court.

• Section 540.600 of the FDA's Compliance Policy
Guide allowance of up to one part of methyl mer-
cury per million non-mercury parts of the edible
portion of seafood.

Under Federal Rule of Evidence ("FRE") 201, courts

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 87633 (D.N.J.)
**(Cite as: 2007 WL 87633 (D.N.J.))**

can judicially notice public records. *Lum v. Bank of America,* 361 F .3d 217, 222 n. 3 (3d Cir.2004). FRE 201 states:

A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.

**\*2** Fed.R.Evid. 201

This Court has consistently held that it may take judicial notice of public records on motions to dismiss. *Benak v. Alliance Capital Mgmt. L.P.,* 349 F.Supp.2d 882, 889 n. 8 (D.N.J.2004) (on motion to dismiss court may take judicial notice of publicly available documents and "plaintiffs may therefore be charged with knowledge of relevant public information."). The articles which the Defendant asks this Court to take judicial notice of are all public records and available. This Court, therefore, grants Defendant's motion that this Court take judicial notice of the publicly available information described above.

*Methylmercury in Fish*

The nature of this action necessitates consideration of the facts regarding mercury in the environment, methylmercury in fish and the FDA's approach to the issue of methylmercury in fish.

Mercury is present in nearly all fish. *See* "What You Need to Know About Mercury in Fish and Shellfish," U.S. Dept. of Health and Human Serv. and the United States Envtl. Prot. Agency EPA-823-R-04-005 (March 2004) (hereinafter "The Advisory"). Mercury is a naturally occurring element in the environment and is also released into the air through industrial pollution. *Id.* Mercury that falls from the air often accumulates in streams, oceans and other bodies of water. *Id.* Fish absorb the mercury as they feed in these waters. *Id.* As a result, mercury becomes part of the fish meat and cannot be removed. *Id.*

The FDA has established tolerance levels for methylmercury in fish through nutritional guidelines. *See* Fed. Food and Drug Admin. Compliance Policy Guide, § 540.600 (May, 2005). The FDA has also

noted that "[r]esearch shows that most people's fish consumption does not cause a health concern." *See* Backgrounder for the 2004 FDA/EPA Consumer Advisory: What You Need to Know About Mercury in Fish and Shellfish at p. 2 (2004) (hereinafter, "Backgrounder"). Additionally, the FDA states that "[f]ish and shellfish can be an important part of [a recommended] diet." *Id.* at 2-3.

*Motion to Dismiss*

*Legal Standard for Granting a Motion to Dismiss*

Federal Rule of Civil Procedure 12(b)(6) provides that a court may dismiss a complaint "for failure to state a claim upon which relief can be granted." In deciding a motion to dismiss under Rule 12(b)(6), all allegations in the complaint must be taken as true and viewed in the light most favorable to the plaintiff. *Warth v. Seldin,* 422 U.S. 490, 501 (1975); *Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts, Inc.,* 140 F.3d 478, 483 (3d Cir.1998). However, legal conclusions offered in the guise of factual allegations are given no presumption of truthfulness. *Chugh v. Western Inventory Serv., Inc.,* 333 F.Supp.2d 285, 289 (D.N.J.2004) (citing *Papasan v. Allain,* 478 U.S. 265, 286 (1986)). While a court will accept well-pled allegations as true for the purposes of the motion, it will not accept bald assertions, unsupported conclusions, unwarranted inferences or sweeping legal conclusions cast in the form of factual allegations. *Morse v. Lower Merion Sch. Dist.,* 132 F.3d 902, 906 (3d Cir.1997).

*Claims Under New Jersey Product Liability and Consumer Fraud Acts*

**\*3** Plaintiff's complaint alleges violations of the NJPLA and NJCFA on behalf of herself individually and on behalf of those similarly situated. The allegations are that Defendant knowingly misrepresented, concealed, suppressed, omitted and failed to disclose material information regarding the presence of methylmercury and other harmful compounds in their tuna products with the intent that Plaintiff and members of the class rely upon such concealment. The complaint also accuses Defendant of negligence, breach of the implied warranty of fitness, and strict liability for failure to adequately warn consumers about the mercury compounds contained in its products.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 87633 (D.N.J.)
**(Cite as: 2007 WL 87633 (D.N.J.))**

Defendant argues for dismissal of Plaintiff's complaints under the NJCFA and NJPLA because they are preempted by FDA regulations and advisories which specifically address and regulate the issues of allowable amounts of mercury in its product and whether or not the Defendant is required to warn consumers of the dangers of mercury consumption.

The basis for federal preemption is the Supremacy Clause of the Constitution. *Dewey v. R.J. Reynolds Tobacco Co.,* 121 N.J. 69, 77 (1990). The clause provides that federal law is the "supreme Law of the Land; ... any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." *U.S. Const., art. VI, cl. 2.* This preemption applies equally to state common law and statutory law. *Feldman v. Lederle Lab.,* 125 N.J. 117, 134 (1991) *cert. denied,* 505 U.S. 1219 (1992).

Whether a federal statute preempts state law turns on the intent of Congress when it passed the law and that intention may be either express or implied. *Cipollone v. Liggett Group, Inc.,* 505 U.S. 504, 516 (1992). Federal law overrides state law when (1) Congress expressly preempts state law; (2) Congressional intent to preempt can be inferred from the existence of a pervasive federal regulatory scheme; or (3) state law conflicts with federal law or its purposes. *English v. General Elec. Co.,* 496 U.S. 72, 78-79 (1990).

In this case, there is a pervasive federal regulatory scheme implemented by and through the FDA. The FDA has stated that state laws which require warnings regarding methylmercury in fish are preempted under federal law. *See* Letter from Lester M. Crawford, D.V.M., Ph.D., United States Commissioner of Food and Drugs ("Commissioner Crawford"), to Bill Lockyer, Attorney General of the State of California, dated August 12, 2005, re: a suit filed on June 21, 2004, in San Francisco Superior Court ("FDA Letter").

On June 21, 2004, the Office of the Attorney General of California filed suit seeking an injunction and civil penalties against the Tri-Union Seafoods, LLC, for failing to warn consumers that canned and packaged tuna products were exposing consumers to mercury compounds. The *People of the State of California v. Tri-Union Seafoods, LLC, et al.,* 2006 WL 1544377 (Cal.Super. Case No.: CGC-04-432394). In response to the suit, Commissioner Crawford wrote the FDA Letter which explained that the warnings sought by California would "frustrate the carefully considered federal approach to advising consumers of both the benefits and possible risks of eating fish and shellfish." *See* FDA Letter at p. 1.

**\*4** The FDA Letter also explained that the "FDA has been studying the issue of methylmercury in fish for several years. In so doing, it has compiled substantial data, and has developed significant expertise in analyzing the pertinent scientific issues, together with the consumer education aspects of this matter. As a result, the agency believes that it is uniquely qualified to determine how to handle the public health concerns related to methylmercury in fish. After many years of analysis on this issue, [the] FDA has chosen to issue an advisory rather than to require a warning on fish and shellfish product labels for several reasons." *See* FDA Letter at p. 2.

The FDA issued its 2004 methylmercury advisory to, "inform women who may become pregnant, pregnant women, nursing mothers, and parents of young children as to how to get the positive health benefits from eating fish and shellfish, while minimizing their mercury exposure." *See* FDA Letter at p. 4. The Advisory specifically regulates the levels of methylmercury allowed in canned tuna and specifically rejected the notion that warning labels should be included on cans of tuna. *Id.*

Plaintiff argues that the FDA does not preempt New Jersey state law for failure to warn of the dangers of mercury in the Defendant's tuna. There is a presumption in the law against preemption. *New York Conference of Blue Shield and Blue Cross Plans v. Travelers Ins. Co.,* 514 U.S. 645, 655 (1995). The burden is on the proponent of preemption to overcome the presumption against finding that areas traditionally regulated by the states, such as products liability or consumer protection laws, have been preempted. *Hillsborough County v. Automated Med Lab.,* 471 U.S. 707, 716 (1985).

Plaintiff suggests that the Defendant has failed to carry its burden to overcome the presumption against a finding that either the NJPLA or NJCFA have been preempted by the FDA's actions. In support of its position, Plaintiff states that The Advisory and Back-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 87633 (D.N.J.)
**(Cite as: 2007 WL 87633 (D.N.J.))**

grounder are not entitled to deference and that the FDA Letter is not persuasive.

Plaintiff explains that the FDA has not officially prohibited mercury warnings on cans of tuna regarding methylmercury. For this proposition, Plaintiff argues that the FDA Letter is not entitled to deference from this Court. "Interpretations contained in formats such as an opinion letter are entitled to respect, ... but only to the extent that those interpretations have the power to persuade." *Christensen v. Harris County,* 529 U.S. 576, 587 (2000).

The New Jersey Supreme Court ruled that the lack of a formal FDA requirement for additional warnings on a product does not create a conclusive presumption that labeling which satisfies the FDA also constitutes an adequate warning under state law. *Feldman v. Lederle Lab.,* 125 NJ 117 (NJ 1991), *cert. den.,* 505 U.S. 1219 (1992). As such, if this Court finds that the FDA's regulatory scheme, as described in the Advisory and Backgrounder, is not entitled to deference and that the FDA Letter is not persuasive, then Defendant could comply with both New Jersey and federal law by placing warning labels on their tuna products.

**\*5** The essential issue is whether the FDA's regulatory scheme as explained and embodied in the FDA Letter, Advisory and other materials is entitled to deference from this Court. In arguing that this Court should not defer to the FDA's interpretation of its regulatory scheme in this area, Plaintiff points to the FDA Letter and calls it too informal. In her brief, Plaintiff states that the FDA Letter "appears to have been solicited for the express purpose of derailing litigation against [Defendant] and other seafood companies." Therefore, Plaintiff reasons, the FDA Letter and arguments contained therein are not the product of independent analysis by the FDA, but are simply the parroting of arguments designed to benefit the Defendant and other industry members in this and other potential lawsuits.

An examination of the FDA's response to the potential health hazards of methylmercury in food reveals that the FDA has been collecting data and addressing this concern for years. The FDA issued its first methylmercury fish advisory in the mid 1990s. *See* FDA Letter at p. 3. Since that time, the FDA has compiled more data and has developed significant expertise in analyzing the scientific issues and consumer education aspects of this matter.

After studying the data, the Foods Advisory Committee ("FAC") recommended that the FDA and EPA jointly issue an advisory about mercury in fish for women who might become pregnant, women who are pregnant, nursing mothers and young children. *See* Advisory at p. 1.

On March 19, 2004, the FDA and EPA released The Advisory, with the following message:

Message to Consumers:

Fish and shellfish are important parts of a healthy and balanced diet. They are great sources of high quality protein and other nutrients. However, depending on the amount and type of fish you consume it may be prudent to modify your diet if you are planning to become pregnant; pregnant; nursing; or a young child. With a few simple adjustments, you can continue to enjoy these foods in a manner that is healthy and beneficial and reduce your unborn or young child's exposure to the harmful effects of mercury at the same time.

*See* Advisory at p. 1.

The Backgrounder to the Advisory, released simultaneously, clearly emphasizes the importance of continuing to eat fish as part of a healthy diet:

The Difference Between this Advisory and Previous Advisories:

1. The advisory emphasizes the positive benefits of eating fish.

2. The advisory provides examples of commonly eaten fish that are low in mercury.

* * *

What's Next:

FDA and EPA want to ensure that women and young children continue to eat fish and shellfish because of the nutritional benefits and encourage them to

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 87633 (D.N.J.)
(Cite as: 2007 WL 87633 (D.N.J.))

follow the advisory so they can be confident in reducing their mercury exposure as well.

*See* Backgrounder at p. 2.

Plaintiff argues that the FDA Letter is merely an *ex parte* communication intended to derail litigation against the seafood industry. However, the FDA Letter aside, both the Advisory and Backgrounder excerpted above were released in March, 2004. The California litigation to which the FDA Letter responds commenced on June 21, 2004. Therefore, the Advisory and Backgrounder which evidence a clear effort by the FDA and EPA to encourage the continued public consumption of fish, were released before the complaint in the California case had even been filed. Clearly, the FDA had already taken the position against blanket warning labels before the California suit which prompted the FDA Letter.

**\*6** In advocating the position that the Advisory and Backgrounder have no preemptive effect on the NJCFA and NJPLA, Plaintiff argues that the mere existence of a federal regulatory or enforcement scheme does not by itself imply preemption. *English., 110 S.Ct. at 2279 (1990)*. Plaintiff's opposition to Defendant's motion to dismiss characterizes the Advisory and Backgrounder as "minuscule" actions which are not official regulations and, therefore, not sufficient to preempt state law.

However, it is not uncommon for the FDA to specifically choose the issuance of an advisory rather than an official warning In his letter to the California Attorney General, Commissioner Crawford explained, "[f]irst, consumer advisories are communicated to the target audience directly, rather than to all consumers. Second, the FDA believes that the advisory approach is more effective than a product label statement in relaying the complex messages about mercury in seafood. Third, a label statement that reaches the public at large can also have unintended adverse public health consequences. FDA focus group results have suggested that people who are not in the target audience ... might eat less fish or refrain from eating fish altogether when they receive information about the mercury content of fish ..."

FDA Letter at p. 2-3.

In holding that a formal explicit agency statement is

not necessary for the finding of a preemptive intent, the Supreme Court of the United States explained,

"the Court has never before required a specific formal agency statement identifying conflict in order to conclude that such a conflict in fact exists. Indeed, one can assume that Congress or an agency ordinarily would not intend to permit a significant conflict.

*Geier v. Am. Honda Motor Co., 529 U.S. 861, 884-85 (2000)*.

In *Geier,* the Supreme Court of the United States examined the Department of Transportation's interpretation of the regulation at issue's objectives and the Department's conclusion that tort suits, like the suit against American Honda Motor Co., would stand as an obstacle to the accomplishment and execution of those objectives. The Court reasoned that "the agency is likely to have a thorough understanding of its own regulation and its objectives and is 'uniquely qualified' to comprehend the likely impact of state requirements." *Id.* at 883 *(quoting Medtronic, Inc. v. Lohr, 518 U.S. 470, 496 (1996))*.

Deference to an agency's interpretation of its own powers is appropriate when the regulatory scheme is silent as to preemption. *Barnhard v. Thomas, 540 U.S. 20, 26 (2003)*. Here, the FDA Letter in response to the California litigation only crystallizes the already transparent intent of the FDA to preempt state law that might interfere with the FDA's concern that warnings on tuna products may upset the desired balance between informing consumers of both the benefits and risks of fish consumption:

[The] FDA believes that such warnings are preempted under federal law. They frustrate the carefully considered federal approach to advising consumers of both the benefits and possible risks of eating fish and shellfish; accordingly federal law preempts [California's] warnings concerning mercury and mercury compounds in tuna. Furthermore, [the] FDA believes that compliance with both the FDA and [the California warning] is impossible and, as a result, the latter is preempted under federal law.

**\*7** *See* FDA Letter p. 1-2

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Commissioner Crawford also explained that, "rather than requiring warnings for every single ingredient or product with possible deleterious effects, the FDA has deliberately implemented a more nuanced approach, relying primarily on disclosure of ingredient information and nutrition information ... in order to avoid overexposing consumers to warnings, which could result in them ignoring all such statements, and hence creating a far greater public health problem." *Id.*

For the reasons discussed above, this Court finds that the FDA's Advisory and Backgrounder are entitled to deference and that the FDA Letter is persuasive. Therefore, applying the carefully structured and implemented regulatory scheme of the FDA to Plaintiff's allegations that Defendant was required by New Jersey law to provide warnings about methylmercury and that Defendant's failure to warn constituted a violation of the NJCFA, shows that it would be impossible for Defendant to comply with the FDA and New Jersey law.

It is worth noting that the FDA's regulatory approach has been in effect and has preempted New Jersey state law for the entire period that the Plaintiff's diet consisted almost exclusively of canned tuna (1999-2004). The FDA's published its first methylmercury in seafood advisory in the mid-1990s. *See* FDA Letter at p. 3.

The FDA's regulatory scheme is the result of over ten years of data collection and study. Plaintiff suggests that this Court dismiss the FDA's analysis and deliberately nuanced response to the issue of methylmercury found in seafood. To ask that this Court ignore the evidence of the FDA's carefully balanced approach in favor of Plaintiff's claim that the FDA's treatment of this issue is a contrived response to potential lawsuits against the seafood industry distorts logic. This Court will not turn a blind eye to the evidence of the FDA's ten-year deliberately balanced approach to the issue of methylmercury in fish.

This Court, therefore, grants Defendant's motion that Counts I, II and III of Plaintiff's complaint be dismissed.

*Claims Under Common Law Fraud*

Plaintiff alleges that the actions of Defendant constitute fraudulent conduct, including but not limited to, knowingly making material misrepresentations and omissions regarding Defendant's tuna products upon which Plaintiff reasonably relied. Defendant argues that Plaintiff's common law fraud claims must be dismissed because they are subsumed by the NJPLA.

In *Estate of Brown v. Philip Morris, Inc.,* 228 F.Supp.2d 506 (D.N.J.2002), the decedent's wife brought suit against three cigarette manufacturers asserting that smoking resulted in the death of her husband and alleging both a violation of the NJPLA and common law fraud. *Id.* The court held that the NJPLA "clearly subsumes plaintiff's common-law claims." *Id.* at 516. Put another way, plaintiffs cannot recast a product liability claim as a fraud claim. *Walus v. Pfizer, Inc.,* 812 F.Supp. 41, 45 (D.N.J.1993).

*8 Count IV of Plaintiff's complaint alleges common law fraud asserting exposure to "unsafe methylmercury and other harmful compounds that could result in mercury poisoning." Counts I and II allege a violation of the NJPLA. As was the case in *Estate of Brown,* Plaintiff merely "recasts [her] product liability claims" as fraud claims.

Plaintiff's common law fraud claim is pled in violation of the NJPLA's single cause of action rule. This Court, therefore, grants Defendant's motion that Count IV of Plaintiff's complaint be dismissed.

### CONCLUSION

Based on the foregoing, Defendant's Motion to Dismiss Plaintiff's complaint is **granted.** An appropriate Order accompanies this Opinion.

D.N.J.,2007.
Fellner v. Tri-Union Seafoods, L.L.C.
Not Reported in F.Supp.2d, 2007 WL 87633 (D.N.J.)

END OF DOCUMENT


Not Reported in A.2d, 2008 WL 140819 (N.J.Super.A.D.)
**(Cite as: 2008 WL 140819 (N.J.Super.A.D.))**

C Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Superior Court of New Jersey,
Appellate Division.
George GOLDSWORTHY, Plaintiff-Appellant,
v.
Eric BROWNDORF and Cooper, Levenson, April,
Niedelman & Wagenheim, P.A., as successor in in-
terest to Cooper, Perskie, April, Niedelman, Wagen-
heim & Levenson, P.A., Defendants-Respondents.
Argued Oct. 15, 2007.
Decided Jan. 16, 2008.

On appeal from the Superior Court of New Jersey,
Law Division, Civil Part, Mercer County, MER-L-
2177-04.
Robert A. Vort argued the cause for appellant.

Michael J. Canning argued the cause for respondents
(Giordano, Halleran & Ciesla, attorneys; Mr. Can-
ning, of counsel and on the brief with Kelly D. Gun-
ther).

Before Judges A.A. RODRÍGUEZ and C.L. MINI-
MAN.

PER CURIAM.

*1 Plaintiff George Goldsworthy (Goldsworthy) ap-
peals from a summary judgment in favor of defen-
dants Eric Browndorf, Esquire (Browndorf), and
Cooper, Levenson, April, Niedelman & Wagenheim,
P.A. (the Cooper firm), dismissing his legal malprac-
tice claims against them. Because the trial judge mis-
applied the doctrine of judicial estoppel to bar
Goldsworthy's claims and did not view the facts in a
light most favorable to Goldsworthy, *Brill v. Guard-
ian Life Ins. Co. of Am.,* 142 *N.J.* 520, 540 (1995), we
reverse and remand for further proceedings consistent
with this opinion.

Goldsworthy has owned and operated McDonald's
franchises since 1977. In December 1995, based on
the recommendation of McDonald's, Goldsworthy

purchased four restaurants located in Ocean City,
Cape May, Wildwood and North Wildwood, all sea-
sonal shore communities. Goldsworthy agreed to
purchase these restaurants because he relied on
McDonald's representations that they were turnkey
operations that required little or no cash investment.
This proved to be incorrect and Goldsworthy ulti-
mately invested $800,000 or more to meet McDon-
ald's minimum operational standards. Additionally,
the revenue projections for these seasonal restaurants
proved to be overstated.

As 1997 drew to a close, Goldsworthy's financial
problems in connection with the operation of the four
restaurants became significant. As a result, he re-
tained the Cooper firm in the Fall of 1997 to assist
him in refinancing his debt and the firm assigned the
matter to Browndorf. Because Goldsworthy had some
concerns about the Cooper firm's experience, he told
Browndorf that another McDonald's franchisee had
recommended Douglas Brooks, a Massachusetts at-
torney who had previously sued McDonald's on be-
half of other franchisees, and Browndorf telephoned
Brooks. However, after consulting with other attor-
neys at the Cooper firm, Browndorf told Goldswor-
thy that "they would be happy to work with Brooks,
but that they did not believe it was necessary." The
Cooper firm never sought Brooks' advice and coun-
sel.

During the Winter of 1997-98 Goldsworthy was in
significant financial difficulty as a result of reduced
cash flow. Goldsworthy attributed this reduction to
his mandatory participation in national McDonald's
pricing promotions during the height of the summer
season, a time in which much of his annual revenue
was made. The decrease in cash flow also seemed to
be due to unforeseen competition from two Burger
King Restaurants and road work on local bridges
leading into two of his four restaurants.

As a result of Goldsworthy's financial difficulties, he
fell behind on his loan obligation to MetLife Capital
(MetLife). On January 8, 1998, MetLife sent Golds-
worthy a default notice for the nonpayment of
$243,973.07. MetLife notified Goldsworthy that fail-
ure to remit the past-due amount by January 28,
1998, would cause an acceleration of the notes, re-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2008 WL 140819 (N.J.Super.A.D.)
(Cite as: 2008 WL 140819 (N.J.Super.A.D.))

possession of the collateral, or both. MetLife, Goldsworthy's largest creditor, had a secured claim against him in the amount of $2.7 million. Goldsworthy also became delinquent on his account payable to McDonald's. On January 20, 1998, McDonald's declared him in default under his franchise agreement and demanded payment in full of the outstanding amount, $58,533.42, within sixty days. In addition to the amounts owed to MetLife and McDonald's, Goldsworthy owed over $450,000 in trade debt and another $500,000 in taxes.

*2 After the default notices were issued, Browndorf secured Goldsworthy an extension from McDonald's, which gave Goldsworthy until April 22, 1998, to pay the amounts owed to McDonald's. MetLife, too, agreed to an extension of time to cure the default. However, Goldsworthy did not cure the default within the extended time. Indeed, Goldsworthy's indebtedness to McDonald's grew to about $150,000. When the default on the MetLife loan was not cured by the extended deadline, MetLife accelerated the balance on Goldsworthy's $2.7 million loan.

Thereafter, Browndorf attempted to negotiate with McDonald's and MetLife. First, on February 19, 1998, Browndorf wrote to McDonald's general counsel in advance of a settlement conference to explain why Goldsworthy was having financial difficulties. Browndorf ascribed those difficulties primarily to McDonald's misrepresentations respecting the turn-key nature of the four restaurants and the significant funds Goldsworthy expended to bring them into compliance with McDonald's standards. Browndorf also ascribed Goldsworthy's financial difficulties to a $2.5 million decrease in gross receipts as a result of competition and "certain McDonald's pricing and promotion policies." Browndorf proposed a restructuring of the debt. He advised McDonald's general counsel that his

focus [was] not on litigation. These are last resorts. While we have retained Douglas Brooks to assist us in litigation in the bankruptcy court[,] it is absolutely not something Mr. Goldsworthy wants to pursue.

The next day Browndorf, another attorney from the Cooper firm, and Goldsworthy traveled to Philadelphia to meet with McDonald's representatives and attempt to negotiate a restructuring of Goldsworthy's

obligations. This meeting was unsuccessful and on March 10, 1998, Browndorf wrote to Goldsworthy stating that his impression was that McDonald's "played hardball" and that McDonald's representatives clearly indicated they were unwilling to make any concessions.

By letter dated March 16, 1998, Browndorf confirmed his earlier discussion with Goldsworthy about a potential Chapter 11 proceeding. He pointed out that Chapter 11 would permit a workout with MetLife but not with McDonald's unless Goldsworthy could cure the default under the franchise agreement as required by § 365 of the Bankruptcy Code. He advised that "[t]he only possible exception [to the requirement of a full cure] would be if you could establish the type of extensive fraud claim against McDonald's that we discussed." If Goldsworthy wished to proceed with litigation, Browndorf opined that there would not be "a high probability of ultimate success." Nevertheless, Browndorf assured Goldsworthy that the Cooper firm would pursue litigation if that was what Goldsworthy wanted to do. He stated that the Cooper firm "will rely heavily upon your documentation of the facts." He also observed that the firm would not interview witnesses at that point "[i]n recognition of your limited resources." Browndorf and the Cooper firm did not advise Goldsworthy of his rights under the New Jersey Franchise Practices Act, N.J.S.A. 56:10-1 to -29, at any time before or during the discussions that preceded this confirmatory letter. They also did not advise him that he would be entitled to an award of attorney's fees if he was successful in an action against McDonald's. N.J.S.A. 56:10-10.

*3 After further settlement negotiations with McDonald's were unsuccessful, Browndorf wrote to Goldsworthy on April 16, 1998, advising him that they needed to "take immediate steps to try and resuscitate [the] negotiations." Browndorf further informed Goldsworthy that if no settlement was reached, he needed to authorize the Cooper firm to proceed with a Chapter 11 proceeding in order to give him "the best possible shot at reorganization." Browndorf warned that Goldsworthy would "have to engage in a long shot litigation, notwithstanding the filing, to establish that McDonald's failure to rewrite the Ocean City and Cape May Court House stores was unjustified. This rewrite litigation, as we have discussed several times, is going to be extraordinarily

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2008 WL 140819 (N.J.Super.A.D.)
(Cite as: 2008 WL 140819 (N.J.Super.A.D.))

difficult to win."

As April 22, 1998, loomed on the horizon, Goldsworthy agreed to file a bankruptcy petition to forestall loss of the franchises. The Chapter 11 petition was prepared and signed by Goldsworthy on May 12, 1998, and filed thereafter. McDonald's filed a series of motions on June 19, 1998, including a motion to appoint a trustee and a motion to permit McDonald's to sell substantially all of Goldsworthy's assets.

In late June Browndorf met with Goldsworthy and Paul Cornog, another McDonald's franchisee, "about tactics used by McDonald's against other franchisees and about previous attempted lawsuits." Nevertheless, Browndorf did not advise Goldsworthy of his rights under the Franchise Practices Act. Following this meeting Browndorf and the Cooper firm continued to negotiate with McDonald's for a potential resolution of the matter. Eventually, Goldsworthy, MetLife, and McDonald's agreed to a settlement that required Goldsworthy to resolve all issues by selling his four McDonald's restaurants.

The settlement agreement provided that (1) a § 363 sale would take place to sell all four McDonald's restaurants by auction to the highest and best-qualified bidder; (2) Goldsworthy would retain all of his personal property; (3) Goldsworthy's tax liability totaling in excess of $500,000 would be satisfied by auction proceeds; and (4) Goldsworthy would retain the ability to recover excess proceeds, if available. The Bankruptcy Court had to approve the terms of the settlement. As a consequence, the parties appeared on August 4, 1998. Goldsworthy consulted with Browndorf and then took the stand. The judge asked, "Mr. Goldsworthy, you have only ... less than two weeks to advertise and sell your stores, are you alright with this?" Goldsworthy replied, "Yes." At that time he was still unaware of his rights under the Franchise Practices Act. The Bankruptcy Court determined that Goldsworthy acted in good faith and exercised sound business judgment in deciding to enter into the settlement. The judge approved the settlement and incorporated it into an order on August 4, 1998.

Sometime in late July or early August of 1998, Goldsworthy's wife, Barbara, stated that she spoke with Browndorf about possibly submitting a bid at the auction to purchase the restaurants. Browndorf told Barbara that he could not advise her and that she should retain her own independent counsel. Barbara then contacted Brooks, the Massachusetts franchise attorney. Brooks, however, was not licensed to practice law in New Jersey and recommended another attorney to assist Barbara, Harris Chernow.

*4 The § 363 auction for the four restaurants took place on August 20, 1998. McDonald's purchased the Ocean City restaurant for $1.22 million and the other three restaurants were purchased by a private individual for $1.4 million. Barbara attended the auction with Chernow. She was "flabbergasted" because only one bidder other than McDonald's was present, despite the fact that she was told by the Cooper firm that there was quite a bit of interest in the days leading up to the auction.

Barbara wrote to the president of McDonald's, Alan Feldman, on August 25, 1998, to express her frustration over what had transpired at the auction and more generally to complain about McDonald's mistreatment of her husband and similar franchisees. She forwarded this letter to Brooks on September 1, 1998, and he replied by letter on September 11, 1998. In this letter Brooks observed,

Most of the legislation affecting franchising, including the Federal Trade Commission Disclosure Rule, focuses on disclosure issues at the inception of the franchise. In our experience, most disputes between franchisees and franchisors arise long after the franchise is sold, and do not result from any violation of the various disclosure laws. While a few states have statutes which govern some aspects of the franchise relationship, and most states theoretically recognize that there is an implied covenant of good faith and fair dealing in every contract, in actual practice it is difficult and expensive to enforce these rights.

Other than this communication, Barbara had no contact with Brooks. Neither she nor her husband ever received information about the New Jersey Franchise Practices Act from Brooks.

Goldsworthy sought dismissal of his bankruptcy petition in a certification filed on October 14, 1998. He clearly restated his position that McDonald's was the cause of his financial problems, but stated that the sale was a success. He certified as follows:

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2008 WL 140819 (N.J.Super.A.D.)
(Cite as: 2008 WL 140819 (N.J.Super.A.D.))

Under all the facts and circumstances, I believe the dismissal of this matter represents the most cost effective and efficient manner to resolve this matter. I believe it is in the best interest of all creditors, since they will either get paid in full, get paid agreed upon compromised amounts or they have consented to the dismissal.

The bankruptcy judge approved the dismissal of Goldsworthy's Chapter 11 bankruptcy petition on October 22, 1998.

On August 19, 2004, Goldsworthy filed a complaint against Browndorf and the Cooper firm alleging legal malpractice. Browndorf and the Cooper firm moved on June 21, 2006, for summary judgment, apparently before the end of discovery, relying on four alternative theories. First, they argued that judicial estoppel barred any relief. Second, they contended that the settlement was voluntary, fair and equitable and thus no cause of action existed, citing _Puder v. Buechel, 183 N.J. 428 (2005)_. Third, they claimed that the action was barred by the six-year statute of limitations, _N.J.S.A. 2A:14-1_.[FN1] Fourth, they contended they were not liable to Goldsworthy because they exercised reasonable legal judgment in advising him.[FN2] In support of their estoppel argument, Browndorf and the Cooper firm contended that Goldsworthy must have known of his rights under the Franchise Practices Act because he received a Franchise Offering Circular from McDonald's in May of 1998 that referred generally to Federal Trade Commission information requirements, state franchise laws and multiple lawsuits against McDonald's. Goldsworthy denied that he read the circular, stated that he had merely given it to Browndorf and the Cooper firm when it arrived and pointed out that their billing records did not reflect any time spent reviewing the circular. At the oral argument, counsel for Browndorf and the Cooper firm handed up the September 11, 1998, letter from Brooks and argued that this letter also demonstrated Goldsworthy's knowledge about franchise law.

FN1. This argument was rejected by the motion judge. Browndorf and the Cooper Firm submit in their responsive brief to this court that the judge erred in failing to grant summary judgment based on limitations grounds. However, they did not file a cross-appeal as required by _R._ 2:4-2(a). Therefore,

this issue is not properly before us and will not be considered on appeal. Pressler, _Current N.J. Court Rules,_ comment 2 on _R._ 2:3-4 (2008); _State v. Elkwinsi,_ 190 N.J. 169, 175 (2007).

FN2. The judge indicated that this issue was premature in the absence of further discovery. Browndorf and the Cooper firm did not file a cross-appeal on this basis, and therefore, cannot appeal the denial of their motion on this ground. Pressler, _Current N.J. Court Rules,_ comment 2 on _R._ 2:3-4 (2008); _Elkwinsi, supra,_ 190 N.J. at 175.

*5 The motion judge held that the claim was not barred by the applicable six-year statute of limitations but dismissed Goldsworthy's claim with prejudice under the doctrine of judicial estoppel. The judge found that Goldsworthy's sworn statements in his testimony respecting the merits of the settlement and his later certification in the bankruptcy proceeding respecting dismissal of his petition precluded him from now asserting that he was not sufficiently informed about his franchise options. The judge also expressed concern about the inequity to the creditors in the bankruptcy proceedings were Goldsworthy to prevail on this malpractice action.[FN3] She did not rule on the alternate theories for summary judgment.

FN3. This issue should not have been considered in ruling on the summary judgment motion in this malpractice case.

Following the grant of summary judgment, Browndorf and the Cooper firm moved on September 1, 2006, for an award of attorney's fees and costs of suit. Goldsworthy cross-moved to vacate the summary judgment or, alternatively, to alter or amend it based on his inability to respond to the September 11, 1998, letter from Brooks. The letter had been introduced into evidence on the morning of August 18, 2006, at oral argument. The judge found the letter should have caused Goldsworthy to raise the franchise issue with Browndorf and the bankruptcy judge. On October 20, 2006, the judge permitted Goldsworthy to supplement the record to respond to the Brooks letter and heard oral argument on both motions. She then denied Goldsworthy's motion to vacate the judgment and denied the motion of Browndorf and the Cooper firm for an award of attorney fees and costs of suit.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2008 WL 140819 (N.J.Super.A.D.)
(Cite as: 2008 WL 140819 (N.J.Super.A.D.))

This timely appeal followed.

In reviewing a ruling on a summary judgment motion, we apply the same standard as that governing the trial court. *Prudential Prop. & Cas. Ins. Co. v. Boylan*, 307 *N.J.Super.* 162, 167 (App.Div.), *certif. denied*, 154 *N.J.* 608 (1998); *Antheunisse v. Tiffany & Co.*, 229 *N.J.Super.* 399, 402 (App.Div.1988), *certif. denied*, 115 *N.J.* 59 (1989). Summary judgment is only appropriate if "there is no genuine issue as to any material fact challenged." *R.* 4:46-2(c). As previously noted, the "competent evidential materials" must be "viewed in the light most favorable to the non-moving party. *Brill, supra,* 142 *N.J.* at 540. If they "are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party," summary judgment must be denied. *Ibid.* The motion *must* be considered on the basis that the opposing party's assertions of fact are true. *Id.* at 536. The determination is whether the evidence "is so one-sided that one party must prevail as a matter of law." *Id.* at 536 (quotation omitted). It is readily apparent that summary judgment, predicated as it was on Goldsworthy's alleged familiarity with franchise law, should not have been granted in the face of his unswerving denial of any such knowledge.

Judicial estoppel is an equitable doctrine that protects the integrity of the judicial process. *Cummings v. Bahr*, 295 *N.J.Super.* 374, 387 (App.Div.1996). It "preclud[es] a party from asserting a position in a case that contradicts or is inconsistent with a position previously asserted by the party in the case or a related legal proceeding." *Tamburelli Prop. Ass'n v. Borough of Cresskill*, 308 *N.J.Super.* 326, 335 (App.Div.1998) (citation omitted).

*6 Judicial estoppel does not prevent litigants from pleading alternative positions; rather, it "is designed to prevent litigants from playing fast and loose with the courts." *Newell v. Hudson*, 376 *N.J.Super.* 29, 38 (App.Div.2005) (citation omitted). "[A] party must successfully assert a position in order to be estopped from asserting a contrary position in future proceedings." *Cummings, supra,* 295 *N.J.Super.* at 386. Prior success does not necessarily mean that the party benefited from the position taken, but only that a court allowed them to maintain that position and relied on it to make a judicial determination. *Id.* at 387.

New Jersey "has a longstanding policy that encour-

ages settlements." *Ziegelheim v. Apollo*, 128 *N.J.* 250, 263 (1992). However, our policy favoring settlements and the doctrine of judicial estoppel only bar a litigant from subsequently disputing the fairness and reasonableness of a settlement where the litigant was fully aware of all of the facts and was reasonably advised as to the legal remedies available based on those facts. *Newell, supra,* 376 *N.J.Super.* at 33; *Puder v. Buechel*, 183 *N.J.* 428, 437-39 (2005).

The motion judge relied on *Newell* to apply the doctrine of judicial estoppel in this case. The issue in *Newell,* was "whether a litigant who either lied, or later claimed she lied, about her understanding and voluntary acceptance of the terms of her property settlement agreement, in order to induce the court to accept and incorporate it into a judgment of divorce, is judicially estopped from asserting a [counter]claim for malpractice against her matrimonial attorney based on the settlement." *Newell, supra,* 376 *N.J.Super.* at 30. At the time of the divorce hearing, Hudson represented in court that she understood and voluntarily consented to the terms of the property settlement agreement. *Id.* at 32. Based upon this testimony, the judge approved the settlement and incorporated the agreement into the judgment of divorce. *Ibid.*

Thereafter, the wife sought a modification of the alimony amount, claiming that her former husband's salary was misstated in the agreement as a result of her attorney's negligence and, as a consequence, she received an insufficient alimony award. *Id.* at 32-33. That motion was denied by the Family Part judge. *Id.* at 33.

Hudson failed to pay the divorce attorney's fee and a collection suit was instituted against Hudson. *Ibid.* Hudson counterclaimed alleging malpractice. *Id.* at 33-34. In responding to questions posed at her deposition, Hudson essentially testified that her sworn testimony to the judge hearing the divorce proceeding was false. *Id.* at 34. The attorneys then filed a motion for summary judgment. *Ibid.* In dismissing the malpractice action on the basis of judicial estoppel, the motion judge found that the wife was not misled by her attorney because she testified under oath that she knew what she was doing. *Id.* at 36. The judge also stressed that the wife, who was an accountant, although not tutored in the law, was nevertheless a sophisticated individual who had received sufficient

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

factual information to inform her decision regarding the settlement. *Id.* at 35-36.

*7 In reviewing the grant of summary judgment, we noted that the *Ziegelheim* and *Puder*

courts recognized legal malpractice as a viable cause of action where a matrimonial attorney's negligent pretrial preparation and advice led to the recommendation of an improper settlement. By declining to apply a per se bar, these cases preserve a malpractice claim of a vulnerable litigant who unknowingly enters into an inadequate settlement, believing it is fair, as a result of the arguable negligence of her matrimonial attorney.

[*Id.* at 44.]

We agreed that a legal malpractice action was reserved for "vulnerable litigant[s] who unknowingly enter[ ] into an inadequate settlement, believing it is fair, as a result of the arguable negligence of [their] ... attorney." *Ibid.* Further, we adopted the position of the Idaho Supreme Court, stating that judicial estoppel

should only be applied when the party maintaining the inconsistent position did have, or was chargeable with, full knowledge of the attendant facts prior to adopting the initial position.... [T]he concept of judicial estoppel takes into account not only what a party states under oath in open court, but also what that party knew, or should have known, at the time the original position was adopted.

[*Ibid.* (quoting *McKay v. Owens, 937 P.2d 1222 (1997)*).]

We specifically held that the case before us was "not a case where the litigant was misinformed of the criteria to be employed or was without full knowledge of the attendant facts prior to adopting her initial position." *Id.* at 46.

Quite a different result was reached in *Ziegelheim.* There our Supreme Court held that a client's legal malpractice action against her divorce attorney was not barred under the doctrine of judicial estoppel, despite the fact that the wife had previously accepted a negotiated matrimonial settlement. *Ziegelheim,*

*supra,* 128 *N.J.* at 265. In that case, the wife retained defendant attorney to represent her in an anticipated divorce action. *Id.* at 254. According to the wife, during several meetings they discussed her suspicion that her husband was hiding marital assets and she requested that Apollo inquire into the matter. *Ibid.* Thereafter, the wife executed a property settlement agreement with her husband which was incorporated into their judgment of divorce. *Id.* at 256. The property settlement agreement provided that the wife would receive fourteen percent of the marital assets. *Id.* at 256-57.

When testifying before the lower court after the settlement was read into the record, both parties testified "that they understood the agreement, that they thought it was fair, and that they entered into it voluntarily." *Id.* at 257. Later on, however, the client filed a malpractice action asserting, among other things, that she only agreed to accept the terms of the property settlement based on her attorney's advice that "wives could expect to receive no more than ten to twenty percent of the marital estate if they went to trial." *Id.* at 258. The wife claimed that this advice did not comport with what a reasonably prudent attorney would have provided under the circumstances. *Ibid.*

*8 The Supreme Court "recognize[d] that litigants rely heavily on the professional advice of counsel when they decide whether to accept or reject offers of settlement." *Id.* at 263. In addressing the issue of estoppel, the Court observed, "The fact that a party received a settlement that was 'fair and equitable' does not necessarily mean that the party's attorney was competent or that the party would not have received a more favorable settlement had the party's incompetent attorney been competent." *Id.* at 265. The Court concluded that it was error to grant summary judgment on some of the wife's malpractice claims and reversed in part. *Id.* at 267.

The facts in this case are not sufficient to trigger the bar of judicial estoppel under *Newell* or *Puder, supra,* 183 *N.J.* at 430 (where the client accepted a renegotiated divorce settlement with full knowledge of the alleged malpractice in connection with the first divorce settlement). Goldsworthy did not admit that he was lying when he testified before the bankruptcy court respecting the settlement and when he signed a certification seeking dismissal of the bankruptcy pro-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2008 WL 140819 (N.J.Super.A.D.)
**(Cite as: 2008 WL 140819 (N.J.Super.A.D.))**

ceeding. Rather, he states that he believed he was telling the truth but was ignorant of his rights under the Franchise Practices Act as a result of the malpractice of Browndorf and the Cooper firm. He asserts that but for such ignorance he would not have settled with McDonald's and sold his four restaurants. As a consequence, the doctrine of judicial estoppel has no application to the facts before us.

Reversed and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.

N.J.Super.A.D.,2008.
Goldsworthy v. Browndorf
Not Reported in A.2d, 2008 WL 140819 (N.J.Super.A.D.)

END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.